**Lou DIBELLA and Dibella Entertainment, Inc., Plaintiffs,**

v.

**Bernard HOPKINS, Defendant.**

**No. 01 CIV. 11779(DC).**

United States District Court, S.D. New York.

Sept. 30, 2003.

---

4. The Court notes that in the course of the hearing no marketing expert testimony was

presented from P & G on this issue.

**396**

Judd Burstein, P.C. by Judd Burstein, Esq. and Peter B. Schalk, Esq., New York City, for Plaintiffs.

Cozen O'Connor by Robert W. Hayes, Esq. and Marlo Pagano–Kelleher, Esq., New York City, for Defendant.

## OPINION

CHIN, District Judge.

In this libel case, a jury rendered a verdict on November 19, 2002, in favor of plaintiff Lou DiBella requiring defendant Bernard Hopkins to pay DiBella $110,000 in compensatory damages and $500,000 in punitive damages. The jury found that DiBella had been libeled by statements Hopkins made to a reporter, Steven Kim, that were published in an article on a boxing website on the Internet. The jury found that DiBella had not proven libel as to statements made by Hopkins that were published in two other articles and during a radio interview. The jury also rejected a claim by DiBella and his company, DiBella Entertainment, Inc. ("DiBella, Inc."), for quantum meruit.

Before the Court are: (1) Hopkins's motion for judgment as a matter of law or for a new trial, and (2) plaintiffs' motion for sanctions, a new trial, and an amended judgment. For the reasons that follow, Hopkins's motion for judgment as a matter of law or a new trial is denied. Plaintiffs' motion is also denied to the extent he seeks sanctions and a new trial, although the matter of defense counsel's conduct will be referred to the Court's Committee on Grievances. Plaintiffs' motion is granted to the extent I will issue an amended judgment that includes interest.

## BACKGROUND

### A. *The Facts*

The underlying facts are set forth in my prior decisions. *DiBella v. Hopkins,* 187 F.Supp.2d 192 (S.D.N.Y.2002); *DiBella v. Hopkins,* No. 01 Civ. 11779(DC), 2002 WL 31357812 (S.D.N.Y. Oct. 18, 2002). Construing the evidence presented at trial in the light most favorable to DiBella, the facts may be summarized as follows:

DiBella is an independent advisor, matchmaker, and television packager in boxing. For some years he was employed at the cable network Home Box Office ("HBO"), helping develop HBO's successful boxing program. In 1999, he began considering leaving HBO, and he started negotiating a departure package in early 2000. His intent was to create his own independent company, and eventually he did so by forming DiBella, Inc. He stopped reporting to HBO's offices in early April 2000, and a termination agreement was executed on May 12, 2000. As part of his agreement, DiBella was to be given "dates" on which he would be able to arrange fights to be aired on HBO. (Tr. 358).[1] These "dates" were extremely valuable, for fighters who fought on HBO programs received tremendous exposure. (*Id.* 361–62).

In January 2000, DiBella learned that Roy Jones would be fighting Richard Hall in a match that would be televised on HBO in May 2000. The fight was not considered a particularly good fight. In mid-January, Kery Davis, an HBO employee who worked under DiBella, proposed that Hopkins fight on the undercard of the Jones–Hall fight, suggesting that this would improve the card as it would help build interest in a potential future fight between Jones and Hopkins. A Jones–Hopkins fight would be an exciting fight. Davis suggested Brian Barbosa as an opponent for Hopkins on the Jones–Hall undercard. The Hopkins–Barbosa fight was approved and a deal was reached in January. (*Id.* 367–72).

In early 2000, after the Barbosa fight had been set and when DiBella believed he would be leaving HBO by the end of February, DiBella began discussing a possible relationship with Hopkins. (*Id.* 372–73). In DiBella's view, Hopkins was "a great fighter [who] had been underexposed and undermarketed." (*Id.* 363; *see id.* 373–74, 380). DiBella believed he could help. By February 2000, he and Hopkins had "a handshake agreement." (*Id.* 374). DiBella agreed to provide advice and to assist in marketing and publicity. Hopkins agreed to pay DiBella a $50,000 fee for services for the period prior to December 2000, when Hopkins's next fight would occur. (*Id.* 373–74). The $50,000 fee had nothing to do with HBO's decision to put Hopkins on the undercard with Barbosa for the Jones–Hall fight. (*Id.*). The $50,000 was to be paid after the scheduled Barbosa fight, when Hopkins would be receiving his purse. (*Id.* 378).

When DiBella began his discussions with Hopkins and they agreed to work together, DiBella was still an employee of HBO. Senior HBO management, however, was aware of and consented to DiBella's agreement to work with Hopkins. DiBella told at least four high-ranking executives of HBO that he had an agreement with Hopkins, for, as he recognized, "it was clearly a potential conflict of interest." (*Id.* 381–82). No one at HBO objected, and in fact one or more of the HBO executives told DiBella that "it was a good thing," as HBO was happy at the prospect of Hopkins fighting on one of DiBella's dates. (*Id.* 382; *see id.* 156–57 (Davis testifying that Hopkins was exactly the kind of fighter HBO hoped DiBella would deliver)).

In late March or early April, Hopkins asked DiBella for a loan of $30,000 for training expenses. DiBella lent him the money, without a written loan agreement

---

1. "Tr." refers to the trial transcript. References to "PX," "DX," and "CX" are to, respectively, plaintiffs' exhibits, defendant's exhibits, and Court exhibits received at trial.

"Def.'s Mem." refers to Hopkins's memorandum of law in support of his motion for judgment as a matter of law or for a new trial.

and at no interest, because Hopkins was now his client and DiBella "trusted him." (*Id.* 382–83). DiBella told HBO executives about the loan because he was still "technically" an HBO employee. HBO did not object. (*Id.* 383–84).

In the meantime, Barbosa suffered an injury in March and it became apparent that he would not be able to fight Hopkins as scheduled in May. Barbosa was replaced by a fighter named Syd Vanderpool. (*Id.* 385–88).

DiBella's employment with HBO ended officially on May 12, 2000. The Hopkins–Vanderpool fight occurred the next day, and Hopkins won. DiBella was present, working on behalf of Hopkins. (*Id.* 393–94). DiBella watched the Jones–Hall fight, and afterwards he met briefly with Hopkins and Hopkins's lawyer, Arnold Joseph, in a coffee shop or restaurant. They did not offer him payment of the $50,000 fee or repayment of the $30,000 loan. (*Id.* 394–96).

On May 19, 2000, a few days after the fight, Hopkins and Joseph met with DiBella again. They gave him a $30,000 check, in repayment of the loan. (*Id.* 396–97). They showed him a $50,000 check and said they were prepared to pay him the $50,000 fee at that time, but they said they preferred to defer payment of the $50,000 because of litigation that was pending in Denver (the "*America Presents*" litigation). DiBella was expected to be a witness in that case, and they said they were concerned about the appearance of paying a $50,000 fee to DiBella when he was expecting to be a witness on Hopkins's behalf. DiBella agreed, because Hopkins was an important client. (*Id.* 398–99).

Thereafter, DiBella worked hard for Hopkins. He advised Hopkins on public relations and building his image and developing a relationship with the press. He negotiated for Hopkins on what turned out

to be a successful fight with Echols in December. (*Id.* 403–07). Hopkins finally paid the $50,000 fee to DiBella after the Echols fight, in January 2001. (*Id.* 405–06, 780).

After the Echols fight, DiBella continued to work to build Hopkins's image and profile, with a view toward creating opportunities for him. Eventually, he called the boxing promoter Don King and proposed a middleweight tournament that would include Hopkins. At the time, the three major boxing ratings organizations each had a different middleweight champion— Hopkins, William Joppy, and Keith Holmes. In addition, Felix Trinidad, one of the most celebrated boxers in the world, was about to move from the super welterweight class into the middleweight class. The concept was to have a middleweight tournament involving the three champions and Trinidad—culminating in a match that would produce the "undisputed" middleweight champion of the world. (*See id.* 407–13).

DiBella acted as lead negotiator for Hopkins. He also provided Hopkins with advice and pressed Hopkins to agree to a relationship with King when Hopkins was reluctant to do so. Such a relationship was critical—the other three fighters were under contract to King and King would not agree to permit Hopkins to participate without a long-term deal, for King would lose control of the middleweight championship if Hopkins won the tournament without a commitment to remain with King. Eventually, a deal was struck. (*Id.* 414–18). DiBella agreed to allow one of his HBO dates to be used. (*Id.* 420).

The tournament was a huge success from Hopkins's perspective. He beat Holmes in his preliminary match and Trinidad beat Joppy in the other preliminary match. That set the stage for the champi-

onship match between Hopkins and Trinidad. On September 29, 2001, in what was generally regarded as a great fight, Hopkins beat Trinidad by a final round technical knockout. Hopkins thus emerged from the tournament as the "undisputed" champion of the world. The fights were televised and Hopkins received tremendous exposure and attention.

Yet, within weeks after the Trinidad fight, Hopkins stopped returning DiBella's telephone calls. As DiBella testified: "Just all of a sudden everything ended." (*Id.* 430–31).

In December 2001, Steven Kim, a reporter for Maxboxing.com, an Internet boxing magazine, called DiBella and asked for a comment: he said that Hopkins had stated that DiBella " 'took a bribe of $50,000 to put him on HBO.' " (*Id.* 433). On December 20, 2001, Kim published an article on the Internet at Maxboxing.com that quoted Hopkins as follows:

> Understand, every time I fought (the past couple of years), Lou DiBella got paid, even when he was with HBO, which is f* *king wrong. What I'm saying is that the bottom line is, the Syd Vanderpool fight, should an HBO employee accept $50,000 while he's still working for HBO? So the thing is everyone's trying to make Lou this angel and that Bernard Hopkins is a f* *kin' dummy because they had nothing to say after I kicked Trinidad's ass and they're trying to make me look like the bad guy. So if they want the cat out the bag, then let's let the f* *king cat out of the bag. Ask HBO why an employee of their company asked me to give him $50,000? And I paid him too. Now, is that ethically right? You think Time Warner wants to hear about that? What I'm telling you right now is some serious, serious allegations, but these guys here try to make it seem like I'm the bad guy

and Lou is probably whispering stuff around, too, probably, but he probably isn't saying anything openly. And that influence can hurt me when I get to HBO, being friends with the people over there.

(PX 35). He also told Kim, as quoted in the article:

> Why let the cat out of the bag now? What's on my mind? What's on my mind is that if anybody has influence behind the scenes about Bernard Hopkins crossing Lou DiBella, they've got to understand that it was me taking out of my career before I even fought Trinidad, that paid to get on a card. Was the money wired, or the checks sent prior, yeah, that was a way of not being discovered. The bottom line is, where did the $50,000 come from? It wasn't a gift. I didn't know him that well to give him $50,000. Way before he started establishing his relationship with me as far as an advisor. So what I'm saying is that every time Lou DiBella did something for Bernard Hopkins or played a role for Bernard Hopkins, even when he was with HBO, he got paid.

(*Id.*). He also said the following, as quoted by Kim:

> The bottom line is, I'm not in litigation with Don King, but I may be with someone else. . . . Because I can tell you right now, I can back up every damn thing I'm saying and it's going to make certain people who are wrong run under the covers and wish I never said it. Because other people are going to ask questions and they're going to start digging.

(*Id.*).

DiBella read the article, and he described his reaction to the jury as follows:

> It was devastating to me. It was one of the hardest things I ever read. I also

thought Bernard was not just a client. I thought we were actually friends so that really blew me away that someone would try to destroy me with a lie, that someone would try to destroy me like this. I could have lived with being thrown out of the equation. I could have lived with him just unceremoniously dumping me. I am not a little kid but to attack everything that I am, to attack my integrity, to say I am a crook, it killed me.

.      .      .      .      .

[In the days and weeks and months that followed] I felt to an extent like I had been walking around with a scarlet letter. Here is another bad guy in boxing and I have never been another bad guy in boxing. And it's a very serious allegation when someone says you took a bribe, you sold a date. Never did I do this, and I had done all good for Bernard Hopkins, all good for Bernard Hopkins. And when I read that I was ripped apart, and I am still ripped apart. . . .

(Tr. 434).

Statements similar to the statements quoted in the Kim article were published in other newspapers and on the radio, attributed to Hopkins.

## B. *Prior Proceedings*

This action was commenced by DiBella and DiBella, Inc. on December 21, 2001. The original complaint asserted claims for libel, breach of contract, and quantum meruit. The breach of contract claim was dropped, and an additional libel claim was added based on a radio interview that Hopkins gave to the ESPN Radio Network after the action was started.

The case was tried to a jury from November 4 to 19, 2002. The jury was asked to decide four libel claims—based on statements made by Hopkins as reported in the Kim article and two other articles and on ESPN radio—and the quantum meruit claim. The jury found in favor of DiBella on the libel claim based on the Kim article, awarding DiBella $110,000 in compensatory damages and $500,000 in punitive damages. The jury found in favor of Hopkins on the remaining libel claims as well as the quantum meruit claim.

Judgment was entered accordingly. These motions followed.

## DISCUSSION

### A. *Hopkins's Motion*

Hopkins moves for judgment as a matter of law or for a new trial on four grounds: (1) the jury's verdict finding libel as to the Kim article was inconsistent with its findings of no liability with respect to the other publications; (2) DiBella failed to prove falsity and actual malice as to the Kim article by clear and convincing evidence; (3) the evidence did not support the jury's award of punitive damages; and (4) the Court erred in two evidentiary rulings. I address each ground in turn.

### 1. *The Consistency of the Verdicts*

■ Hopkins's inconsistent verdicts argument is rejected, for the following two reasons.

First, Hopkins has waived the argument, for he did not object to the verdicts as being inconsistent or otherwise raise the issue before the jury was excused. (Tr. 1533). By failing to raise the issue while the jury was still empaneled, Hopkins waived the objection. *See Laborde v. City of N.Y.*, No. 93 Civ. 6923, 1999 WL 38253, at *7 (S.D.N.Y. Jan. 27, 1999) ("An objection to inconsistent verdicts raised for the first time in a post-trial motion is untimely and procedurally barred."); *see also Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir.1992). If the issue had

been raised before the jury was discharged, the jury could have been asked to address any purported inconsistencies and to clarify or reconsider the verdicts. *See Trinidad v. Am. Airlines, Inc.*, No. 93 Civ. 4430, 1997 WL 79819, at *2 (S.D.N.Y. Feb. 25, 1997). It is too late for Hopkins to complain now.

■ Second, even assuming Hopkins did not waive the objection, the verdicts are not necessarily inconsistent and instead can be reconciled. *See, e.g., Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir.2001) (holding that court "must adopt a view of the case, if there is one, that resolves any seeming inconsistency") (internal quotations and citations omitted); *Velez v. Goldco Indus., Inc.*, No. 00 Civ. 9704, 2002 WL 31164364, at *2 (S.D.N.Y. Sept.30, 2002). The Kim article was accompanied by an audiotape of the actual interview that Kim conducted of Hopkins, and Kim testified himself. As discussed further below, the jury could hear Hopkins's statements in his own voice and words. They heard from Kim as well, and Kim was the only reporter of the reporters in question to testify. The jury thus had a more substantial basis on which to find falsity and actual malice. Although the ESPN interview was also on audiotape, the statements were different and Hopkins's explanation for his comments was one that the jury could have accepted— that *he* was asking questions of the reporter. (*See* Tr. 786–89 (Hopkins testifying that he was asking the ESPN reporter whether the reporter thought DiBella's conduct was criminal)).

Accordingly, the inconsistent verdict argument is rejected.

## B. *The Sufficiency of the Evidence of Liability*

Hopkins argues that the evidence did not support the jury's findings as to either falsity or actual malice. I address each area separately.

### 1. *Falsity*

■ Hopkins's contention that DiBella did not present clear and convincing evidence of falsity is plainly wrong. The jury's finding that Hopkins's statements, as published in the Kim article, were false was well supported by the evidence.

Hopkins told Kim that "every time I fought ..., Lou DiBella got paid, even when he was with HBO, which is f* *king wrong." He said that "the bottom line is, the Syd Vanderpool fight, should an HBO employee accept $50,000 while he's still working for HBO?" He said:

> [I]t was me taking out of my career before I even fought Trinidad, that paid to get on a card. Was the money wired, or the checks sent prior, yeah, that was a way of not being discovered. The bottom line is, where did the $50,000 come from? It wasn't a gift. I didn't know him that well to give him $50,000. Way before he started establishing his relationship with me as far as an advisor. So what I'm saying is that every time Lou DiBella did something for Bernard Hopkins or played a role for Bernard Hopkins, even when he was with HBO, he got paid.

(PX 35). Hence, Hopkins was saying that he paid DiBella every time DiBella did something for him, and in particular that he paid DiBella $50,000 when DiBella was still employed by HBO so that he could fight Vanderpool on the Jones–Hall undercard. He was saying that he paid the $50,000 to DiBella long before the two started a relationship as boxer-advisor. Clearly, he was saying in substance that he bribed DiBella by paying him $50,000 when he was still employed at HBO so that he could fight Vanderpool on HBO.

DiBella presented substantial—indeed, clear and convincing—evidence to show that these statements were false, including the following:

— DiBella denied, under oath, that he had solicited or was paid a bribe by Hopkins;

— DiBella testified that he and Hopkins agreed on a $50,000 fee for consulting, public relations, and marketing services DiBella was going to render after he left HBO, and that the agreement was reached in February 2000, after the Hopkins–Barbosa fight had been set and at a time when DiBella expected to be gone from HBO by the end of February;

— DiBella and Davis testified that it was Davis's idea, not DiBella's, to put Hopkins on the Jones–Hall undercard; although DiBella approved the undercard, Davis was the driving force;

— DiBella did not receive *any* money from Hopkins prior to May 12, 2000, when DiBella's employment with HBO was officially terminated; no checks were sent and no monies were wired "prior" to his departure [2];

— in fact, DiBella loaned Hopkins $30,000, without interest, for training expenses, in late March or early April 2000; hence, instead of taking money from Hopkins, DiBella gave money to Hopkins;

— Hopkins did not repay the $30,000 loan until six days after the Vanderpool fight, seven days after DiBella's employment with HBO had ended;

— the $50,000 fee for services rendered was not paid by Hopkins to DiBella until January 2001, months after DiBella had left HBO;

— DiBella disclosed to HBO both his relationship with Hopkins and the loan that he had made to Hopkins; it is highly unlikely that he would have made these disclosures had he solicited a bribe from Hopkins to get him on HBO; and

— the record contained substantial evidence that Hopkins's story was simply not true.

The jury accepted DiBella's testimony and the testimony of DiBella's witnesses, and this testimony constitutes clear and convincing evidence that Hopkins's statements were false.

Hopkins argues now, in his post-trial motion, that the "essence" of his comments to Kim was that DiBella was "fairly compensated for whatever benefits he ever conferred upon" Hopkins and that Hopkins was merely questioning the ethics of DiBella's negotiating a $50,000 fee while still employed at HBO. (Def.'s Mem. at 19–20). But this is not what Hopkins said to Kim in the interview. He did not merely question DiBella's ethics or suggest that he had already been fairly compensated. He accused DiBella of soliciting and accepting an under-the-table payment or, indeed, a bribe. Moreover, to the extent the statements were arguably ambiguous, the jury interpreted the statements and took them to mean that Hopkins was accusing DiBella of soliciting and accepting an under-the-table payment from Hopkins while still employed at HBO.

The transcript of the complete interview eliminates any doubt. Revealing his shock at Hopkins's accusations, Kim says at one point: "What? So who did you have to give $50,000 to?" Hopkins responds: "Lou DiBella!" Kim answers back: "Really!?!" (PX 61 at 22). After Hopkins reiterates

---

**2.** Although his testimony was far from clear, even Hopkins seemed to acknowledge at trial that no monies were actually wired or sent to DiBella prior to his departure from HBO. (*See* Tr. 780–82).

that he paid DiBella when DiBella was still at HBO, Hopkins asks Kim rhetorically: "Now what is that saying?" Kim responds: "That's saying he's taking money under the table." (*Id.* at 26). As Kim testified at trial, by giving that response he was confirming what he understood Hopkins to be saying. (Tr. 847). Hopkins did not contradict Kim's characterization of what he was saying, and confirmed that Kim had understood him correctly. (*Id.* 846–47).

Hence, the jury's finding of falsity was supported by clear and convincing evidence.

### 2. *Malice*

■ Hopkins also argues that the jury's finding that Hopkins published the statements with actual malice, *i.e.*, with knowledge that they were false or with reckless disregard for their truth or falsity (*see* Tr. 1480), was not supported by clear and convincing evidence. The argument is rejected.

The record contains ample evidence that Hopkins knew his statements to Kim were false or, at minimum, that he acted with reckless disregard for the truth, including the evidence of falsity discussed above. Given the substance of the statements— DiBella demanded and received an under-the-table payment of $50,000 while he was still employed at HBO—Hopkins had to have known the statements were false. Again, Hopkins knew or should have known that no monies were wired or checks sent "prior" to DiBella's departure from HBO, and Hopkins knew or should have known that DiBella did not solicit the money to arrange to put or keep Hopkins on the Jones–Hall undercard on HBO.

Hopkins defended the case on the theory that his statements were true. He presented evidence that while he was meeting with his lawyers, Arnold Joseph and Scott Magargee, in their offices in Philadelphia on April 11, 2000, DiBella telephoned and demanded the $50,000 payment in return for keeping Hopkins on the card to be televised on HBO in May 2000. (*See* Tr. 31 (in opening, Hopkins's counsel arguing that DiBella demanded $50,000 on April 11, 2000 to keep Hopkins on the card to be televised on HBO), 1359 (in summation, Hopkins's counsel arguing that Hopkins, Joseph, and Magargee heard DiBella demand $50,000 payment in an April 11, 2000 telephone conversation, and that "the $50,000 payment was to get on that card")). The jury was presented with substantial evidence to show that this meeting and the telephone call never happened; in fact, as discussed below, the jury heard evidence to show that Hopkins did not meet with the lawyers on April 11, 2000, and further, that Hopkins and his lawyers tried to hide that evidence. By finding that Hopkins had fabricated this story, the jury surely had a basis for concluding that Hopkins knew his statements were false.

Hence, the jury's finding of malice was supported by clear and convincing evidence.

### C. *Punitive Damages*

■ Hopkins also argues that DiBella "did not demonstrate any basis for the award of punitive damages." (Def.'s Mem. at 28). He does not challenge the amount of the punitive damages award as excessive, but argues only that there was no basis for an award of punitive damages at all. (*Id.* at 28–29).

Of course, the "malice" required for an award of punitive damages is different from the "actual malice" standard required to prove libel—knowledge of falsity or reckless disregard for truth or falsity. The jury was charged that it could award punitive damages only if it found that Hop-

kins made his statements "maliciously," that is, "with deliberate intent to injure" or with "hatred, ill will, or spite" or with "wilful, wanton, or reckless disregard of [DiBella]'s rights." (Tr. at 1484–85).

The record contains substantial evidence to support the jury's finding that Hopkins acted with the requisite state of mind.

The transcript of the interview that Kim conducted of Hopkins shows unequivocally that Hopkins's intent was to use Kim to hurt DiBella. He says to Kim: "Now it's time to come out swinging." (PX 61 at 28). Indeed, Hopkins says to Kim: "I'm saying—so, so, so what I'm saying to you Steve, you gonna slay the fucking bastard!" (*Id.* at 32). Indeed, when these portions of the tape were played for Hopkins at trial, he testified as follows:

Q. You were coming out swinging, correct?

A. Yes.

Q. And your goal was to, in effect, from a professional standpoint, kill Mr. DiBella in this business by what you were saying?

A. They some strong words just telling the truth. That's what I was always told. Just tell the truth.

Q. Let's play 61–11.

(audiotape played)

A. You said kill.

Q. Well, what did you understand by the word slay?

A. Well, from the boxing standpoint it means that you, you know, somebody come out and implicate something you have done, you go out and say it again. And whether it's slay, whether it's put the truth out there, that's just a figure of speech used in boxing. It's used all the time.

Q. Who was the M–F"er that you were going to slay?

A. Lou DiBella.

(Tr. 791–92).

The transcript also shows that Hopkins was intent on making sure that Kim used his actual words, as he says: "you use my words," "that's what you put in there," "Listen to what I just said—this is how you do it," and "let's be clear—and I'm going to keep repeating myself 'till you say Bernard, ok, I got it.'" (PX 61 at 23, 25, 30). Indeed, Kim testified that he understood that Hopkins wanted him to write an article specifically containing Hopkins's allegations. (Tr. 845).

Hopkins's statements also show that he understood the seriousness of his statements. He tells Kim "but one thing that I'm gonna tell you—and it's gonna sum it up and it's gonna raise your God damn antennas when you put the phone down." (PX 61 at 19). Indeed, he explicitly acknowledges to Kim that these are "some serious, serious allegations." (*Id.* at 23).

Finally, the transcript also shows that Hopkins somehow believed he was safe from liability because he was making his statements to a reporter. He said to Kim during the interview: "you got the tape recorder, and you can't be held accountable for nothing, because you're protected by the Constitution of America." (*Id.* at 18). The jury could have reasonably found that Hopkins uttered false, serious allegations, with the intent to hurt DiBella, erroneously believing that he would be insulated from liability because the allegations would be published by a reporter protected by the First Amendment.

The tape, together with all the evidence in the record, provided a more than sufficient basis to support the jury's award of punitive damages.

## D. *The Evidentiary Rulings*

Hopkins argues that the Court erred in (1) excluding the testimony of his proposed

expert witness, W. Michael Hoffman, and (2) admitting evidence relating to the *America Presents* litigation. Both arguments are rejected.

Hoffman's proposed testimony was the subject of an in limine motion before trial. The parties briefed the issue and I ruled in a written decision. *See Dibella v. Hopkins*, No. 01 Civ. 11779(DC), 2002 WL 31427362, at *3–4 (S.D.N.Y. Oct. 30, 2002). For the reasons stated therein, I believe that my decision to exclude the evidence was correct. *See generally Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) (excluding expert testimony).

Likewise, I believe my decision to allow evidence relating to the *America Presents* litigation was also correct. Joseph was a key witness at the trial in this case. DiBella presented concrete evidence from which the jury could find that Joseph had lied to the judge presiding over the *America Presents* litigation—a case that had been filed in federal court in Denver. Moreover, the statements by Joseph related to the issues presented here—Joseph represented to the judge there that DiBella had no relationship with Hopkins, when that was not so. Magargee was present when Joseph made the representations, and thus this evidence bore on his credibility as well. These circumstances provided Joseph and Magargee with a motive to lie, as a jury verdict in favor of DiBella on his quantum meruit claim would have been wholly at odds with Joseph's representation to the *America Presents* court. DiBella was entitled to present this evidence relating to Joseph's and Magargee's bias, motive, and credibility to the jury. This

issue was discussed at a pretrial proceeding on October 28, 2002, and my reasoning, as articulated on the record that day, stands. (*See* 10/28/02 Tr. 11–23).

Hence, this prong of Hopkins's motion is denied as well.

### E. *DiBella's Motion*

■ Plaintiffs move for sanctions, a new trial, and an amended judgment. Because the first two prongs of the motion are based on purportedly improper conduct by Hopkins and his counsel in this case, I address those two prongs together before I proceed to the request for an amended judgment.

#### 1. *The Misconduct of Hopkins and His Attorneys*

Plaintiffs seek sanctions pursuant to 28 U.S.C. § 1927 and this Court's inherent power. DiBella also seeks a new trial on all libel counts as to which the jury did not find in his favor. Both requests are based on conduct that I agree was highly improper.[3]

#### a) *Facts*

Based on the record before me, I make the following findings of fact:

The critical factual issue in the case was whether DiBella, while still employed at HBO, solicited a $50,000 bribe or under-the-table payment from Hopkins to put him on the card to be televised on HBO in May 2000. This was the crux of the statements Hopkins had made to Kim and others.

---

**3.** Plaintiffs also seek sanctions based on the prior conduct of Hopkins and his attorneys in the case, including Hopkins's attorneys' purportedly "obstructionist" conduct at his deposition and their filing of a purportedly frivolous summary judgment motion. I denied plaintiffs' prior motion for sanctions in these respects, *see DiBella v. Hopkins*, No. 01 Civ. 11779(DC), 2002 WL 31357812, at *3 (S.D.N.Y. Oct. 18, 2002), and I decline to revisit these matters now. I focus here on the issues raised by Hopkins's attorneys' handling of the time sheet.

At trial, the parties offered two wholly conflicting scenarios in this respect: DiBella denied the allegation and testified that although he did enter into an agreement with Hopkins, he did so in February 2000 based on his expectation that he would be leaving HBO shortly, and that he would then provide Hopkins with services in return for a $50,000 fee. According to DiBella, the agreed-upon fee had nothing to do with the fight in May. In contrast, Hopkins, Joseph, and Magargee testified that DiBella solicited a $50,000 payment from Hopkins during a telephone call on April 11, 2000, when Hopkins, Joseph, and Magargee were meeting at the lawyers' offices in Philadelphia, in return for arranging for Hopkins to be or remain on the card in May. At trial, Hopkins's lead attorney, Robert W. Hayes, made the latter assertion both in his opening statement and in his summation.

At trial, Hopkins called Magargee as a witness. Magargee testified on direct examination, by Hayes, in substance as follows:

In April 2000, he and Joseph were meeting with Hopkins in their Philadelphia offices to prepare for the *America Presents* trial. (Tr. 1127, 1129). Magargee walked into a conference room where Joseph and Hopkins were already meeting, and DiBella was on the speaker phone. (*Id.* 1129). He heard DiBella discussing the undercard for a Roy Jones fight in the middle of May 2000. He then heard DiBella say that "he could get or could convince HBO to get Bernard on that undercard" and that "his fee in connection with that" would be $50,000. (*Id.* 1130).

Hayes then showed Magargee Defendant's Exhibit 75, a redacted portion of Magargee's time sheet for April 11, 2000. (*Id.* 1130, 1133–34). The entry in question, for work Magargee had done on the *America Presents* case, read as follows:

REVISIONS TO L. DI BELLA AFFIDAVIT, DISCUSSIONS WITH A. JOSEPH, CALLS WITH L. DI BELLA, MEETING WITH D. ELBAUM TO DISCUSS TESTIMONY

(DX 75). Hayes confirmed with Magargee that part of the time sheet had been "redacted, blocked out to protect the privileges that might apply." (Tr. 1133). Hayes then asked leading questions to bolster Magargee's testimony that the critical telephone conversation had occurred on April 11, 2000:

Q. Is this to mainly pinpoint the date on which you had the conversation with Mr. DiBella about—does this allow you to pinpoint the date in which you heard the conversation about the Vanderpool fight and payment of $50,000?

A. Yes. It would be April 11th of 2000.

Q. Again, just so the record is clear, how can you draw the conclusion from that time [sheet] that that's the day it happened?

A. Based upon the documents that related to the preparation of the affidavit and the time when this occurred prior to trial in the week prior to trial, that that was my recollection as to when it occurred.

(Tr. 1134). Hence, Hayes were seeking to use the time sheet to corroborate Magargee's testimony that the purported April 11, 2000 telephone conversation with DiBella occurred.

On cross-examination, DiBella's counsel, Judd Burstein, quite properly sought to question Magargee on the time sheet. In particular, although Magargee testified that he met with Hopkins and Joseph in person on April 11, 2000, the redacted time sheet does not indicate that there was any meeting with Hopkins on that date. (*See* DX 75). When Burstein asked the question, however, Hayes objected:

[By Mr. Burstein]

Q. You will agree, sir, that there is nothing in your billing record that suggests that you met with Bernard Hopkins on April 11th?

MR. HAYES: Objection. It's been redacted.

MR. BURSTEIN: Oh, that's—I would like a sidebar on that, your Honor.

THE COURT: That objection is overruled and the jury should disregard it. That—really.

If there is something here about Mr. Hopkins being present it should be there.

(Tr. 1164). Hayes's objection was improper, for he was suggesting to the jury that there had been a reference to a meeting with Hopkins, and that the reference had been redacted.

I immediately held a sidebar. Hayes denied what he had just said, as he asserted: "I didn't say it was redacted." (*Id.* 1165). Of course, he had made that very statement. (*See id.* 1164 ("MR. HAYES: Objection. It's been redacted.")). The following colloquy ensued, outside the presence of the jury:

MR. BURSTEIN: . . . I think it's important that the court let the jury know that there is nothing in that time record reflecting a meeting with—

MR. HAYES: I don't know whether there is or isn't.

THE COURT: I don't know whether there is but I would guess that if there were something that that would be—

MR. HAYES: If it's relating to this meeting it certainly would have been there. I put everything in there. I don't understand.

(*Id.* 1166).

Burstein asked for an instruction, and I gave the jury the following instruction:

THE COURT: Ladies and gentlemen, let me just explain something. You have before you Defendant Exhibit 75 and you see in the far right column there is a narrative. This is a description that Mr. Magargee wrote to describe what he did that day. You can tell that certain things have been whited out. Those things were whited out because Mr. Hopkins and his lawyers asked that they be whited out on the grounds that this contained privileged information that was unrelated to this particular case. Maybe it had something to do with America Presents, I don't know. But the argument was that it should be whited out . . . because it does not have anything to do with this case and Mr. Burstein does not know what was whited out because it was whited out by Cozen O'Connor before it was produced.

One would think that if Mr. Hopkins was present at a meeting that that would be in the narrative. And that is the point that Mr. Burstein was trying to make. And Mr. Hayes objected on the grounds that that had been redacted.

Now, I thought that is what Mr. Hayes said and if that is not what he intended, that is fine.

(*Id.* 1166–67). My instruction was interrupted, as Hayes requested another sidebar. I then finished my instruction to the jury:

THE COURT: Let me finish my instruction.

.    .    .    .    .

So Mr. Burstein's point that he was trying to make, and it's up to you to decide whether he makes it or not, but the point he was trying to make was that if Mr. Magargee had met with Mr. Hopkins, that he would have listed or he would have said meeting with Mr. Hop-

kins. It's of course possible that Mr. Magargee just didn't write down Mr. Hopkins' name. That is one possibility. Mr. Burstein would argue that Mr. Hopkins' name is not listed because he wasn't there. It's up to you to decide whether Mr. Magargee is telling the truth or not. When Mr. Hayes stood up and objected on the grounds that there might have been a redaction that referred to Mr. Hopkins being there, I have sustained the objection. I am instructing you to disregard that comment because if there was an entry that says that Mr. Hopkins is there that should have been included in what was produced. That should not have been whited out. And, again, it's up to you to consider all of this together with all of the evidence in the case.

(*Id.* 1170–71). I ordered Hayes to submit the unredacted time sheet for *in camera* review. (*Id.* 1172).

The unredacted time sheet was submitted to the Court *in camera,* and the full, unredacted narrative reads as follows:

*PREPARATION FOR TRIAL— DRAFTING OF MOTIONS IN LIMINE,* REVISIONS TO L. DI BELLA AFFIDAVIT, DISCUSSIONS WITH A. JOSEPH, CALLS WITH L. DI BELLA, MEETING WITH D. ELBAUM TO DISCUSS TESTIMONY, *PREPARATION OF WITNESS OUTLINES, SENDING OF SECOND SUBPOENA TO HBO FOR DI BELLA, CALLS WITH B. HOPKINS*

(CX 1). The redacted portions are underscored. Significantly, Hopkins's attorneys redacted the last entry: "CALLS WITH B. HOPKINS." Of course, that entry contradicted the testimony that Magargee and Joseph had *met* with Hopkins in Cozen O'Connor's Philadelphia offices on that day, for if Hopkins had been present there would have been no need for telephone calls with him. The absence of any reference to a meeting together with the references to telephone calls constituted strong evidence that Hopkins was not present and that no meeting occurred.

Unfortunately, I did not see the unredacted time sheet until after Hayes had given his summation and Burstein had started his summation. As soon as I noticed the entry to "CALLS WITH B. HOPKINS," however, I interrupted Burstein's summation and saw counsel at a sidebar:

THE COURT: I was just handed the unredacted version and I am extremely, extremely troubled by this because i[t] says on it "Calls with B. Hopkins" and if Mr. Magargee is supposedly meeting with Mr. Hopkins why would he be calling him?

(Tr. 1412; *see id.* 1411). I showed the unredacted time sheet to counsel, and Burstein asked that the record be reopened so that he could offer the unredacted time sheet into evidence. I granted his request. I explained to the jury that I had just then reviewed the unredacted time sheet, and that I was receiving the unredacted time sheet into evidence as Court Exhibit 1. (*Id.* 1412–14).

Burstein immediately published the exhibit to the jury and commented on it extensively, arguing to the jury that:

Everything you need to know about Bernard Hopkins and the fraud he has tried to perpetrate upon you in this courtroom is encapsulated within this document.... There is nothing showing a meeting with Bernard Hopkins. And Mr. Hayes stood up before you and said "Objection, the document is redacted," suggesting to you that there was something on that document that would show a meeting.

What does this document show, ladies and gentlemen? ... It says, "calls with Bernard Hopkins." They hid from you the fact that there was no meeting with Bernard Hopkins the day that they say that there was a meeting, there were calls with Bernard Hopkins. If there were calls with Bernard Hopkins he wasn't in the office that day, there wasn't a conference call like they said it was.

(*Id.* 1414).

The next business day, while the jury was deliberating, I raised the issue of the time sheet with counsel. Hayes stated that it was his decision to redact the words in question. (*Id.* 1504). I asked what his basis was for redacting the words in question, and I observed that "on their face I don't see how they are privileged or how they relate to work product and on their face it seems to me they are relevant." (*Id.*). He gave a wholly unsatisfactory and unpersuasive answer. (*See id.* 1505–07; *see also id.* 1509–20).

In the end, the matter of Hayes's conduct was not resolved. The jury returned its verdict. This application followed.

### b) *Conclusions*

I consider whether Hopkins's attorneys engaged in improper conduct and, if so, what, if any, sanction to impose.

### (i) *Was the Conduct Improper?*

In my view, Hopkins's attorneys, and in particular Hayes, engaged in improper conduct.

First, Hayes had no good faith basis for redacting the words "CALLS WITH B. HOPKINS" from the time sheet. Those words revealed no privileged communications or any substantive information at all. The entry revealed nothing as to the content of the telephone calls, and the fact that there were telephone calls was not privileged or otherwise protected from disclosure. *See, e.g., Renner v. Chase Manhattan Bank,* No. 98 Civ. 926(CSH), 2001 WL 1356192, at *8 (S.D.N.Y. Nov. 2, 2001) (finding law firm's billing records not privileged where they gave "a relatively terse chronological recitation, and g[a]ve no details with respect to the contents of communications" between attorney and client); *P & B Marina, Ltd. v. Logrande,* 136 F.R.D. 50, 55–56 (E.D.N.Y.1991) ("Billing records and hourly statements which do not reveal client communications are not privileged.").

Second, Hayes redacted the words "CALLS WITH B. HOPKINS" with the intent to mislead. I reach that conclusion because of the absence of any good faith basis for the redaction and because Hayes did not redact entries that disclosed *more* information. Indeed, he engaged in selective redaction. He clearly wanted to hide the information that would undercut Hopkins's position that the telephone call with DiBella occurred during a meeting of Hopkins and his lawyers on April 11, 2000, and yet he revealed information that he thought would be helpful.

Third, Hayes attempted to use the redacted time sheet in a misleading way. He knew the words "CALLS WITH B. HOPKINS" had been redacted, and yet he sought to use the redacted time sheet to bolster Magargee's testimony, even though he knew that the redacted entry undercut the assertion that there was a meeting with Hopkins that day.

Fourth, Hayes's objection to Burstein's question on cross-examination was highly improper, for clearly it was intended to mislead the jury. When Burstein suggested that there was "nothing" in the time sheet about a meeting on April 11, 2000, Hayes objected, saying: "It's been redacted." Hayes was suggesting to the jury

that there was a reference to such a meeting, but that "it" had been redacted. Even if Hayes's reference to "it" was to the time sheet itself rather than to any reference to a meeting, the import was the same: he was saying that Burstein's suggestion that the time sheet contained "nothing" about a meeting was improper because the time sheet had been redacted and any reference to such a meeting had been deleted. Hayes knew, of course, that there was no reference to a meeting, for he had done the redactions himself. To make matters even worse, not only was there no reference to a meeting, there was a reference to telephone calls that was inconsistent with the assertion of a meeting, and that reference had been redacted.

Hayes did all of these things in an effort to mislead DiBella, DiBella's attorneys, the Court, and the jury. Hence, he engaged in multiple layers of improper and inappropriate conduct.

### (ii) *Should Sanctions Be Imposed?*

█ Notwithstanding my views as to the propriety of Hayes's conduct, I will not impose sanctions or order a new trial. Ultimately, I do not believe that DiBella was injured by Hayes's conduct. To the contrary, Burstein seized on the issue masterfully, to DiBella's benefit.

When Hayes made his improper objection, Burstein immediately asked for a curative instruction, and I gave one. Burstein's point was thereby highlighted for the jury: if there had been a meeting with Hopkins, that fact surely would have been noted in the time sheet, and the absence of such an entry was strong evidence that no meeting ever occurred.

Burstein was even more effective during his summation, when the unredacted time sheet finally surfaced. Without missing a beat, Burstein hammered the point that Hopkins and his lawyers had "hid" from the jury the fact that there was no meeting on April 11, 2000, and that this act of deception was part and parcel of the lies that Hopkins had attempted to perpetrate about DiBella. In the end, DiBella and his lawyers were able to rely on the unredacted time sheet, and they made the most of the opportunity. I do not believe that these proceedings were substantially "multiplied" or delayed because of Hayes's conduct. *See* 28 U.S.C. § 1927 ("Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Nor do I believe that DiBella was prejudiced, as Burstein was able to turn the improper conduct to DiBella's advantage. Finally, of course, the jury has already imposed punitive damages in the amount of $500,000.

Hence, DiBella's motion is denied to the extent he seeks sanctions and a new trial. Hayes's conduct, however, is still highly troubling and it cannot be ignored. Accordingly, I will refer the matter of his conduct to the Court's Committee on Grievances.

### 2. *The Request for an Amended Judgment*

DiBella also requests an amended judgment that provides for interest at the C.P.L.R. rate of 9% per annum from the date the verdict was rendered through the date of an amended judgment, citing C.P.L.R. 5002 and 5004. Hopkins has not responded to this prong of the motion. Hence, the request is granted and an amended judgment will be entered accordingly.

### CONCLUSION

For the reasons set forth above, (1) Hopkins's motion for judgment as a matter

of law or for a new trial is denied in all respects, and (2) plaintiffs' motion is denied to the extent it seeks sanctions and a new trial and it is granted to the extent it seeks the entry of an amended judgment to reflect the award of post-verdict interest. The matter of Hayes's conduct will be referred to the Court's Committee on Grievances.

SO ORDERED.