AMERICA PRESENTS, LTD., a
Colorado Corporation Plaintiff
and Counterclaim Defendant,

v.

Bernard HOPKINS, Defendant and
Counterclaim Plaintiff.

No. 99–K–344.

United States District Court,
D. Colorado.

Aug. 12, 2004.

Lee D. Foreman, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Charles L. Casteel, Kristin W. Dale, Michael Powers, Davis, Graham & Stubbs LLP, Carole K. Jeffery, Horowitz, Wake & Forbes, Denver, CO, for Plaintiff.

Kelly Moureen Condon, Holme, Roberts & Owen, LLP, Denver, CO, Adam Ross Eaton, Englewood, CO, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KANE, Senior District Judge.

Jurisdiction in this case is uncontested. It is based on diversity of citizenship and the amount in controversy exceeds $75,000. The law of the State of Colorado applies because the parties elected it.

Defendant Bernard Hopkins is a professional boxer of considerable renown. Included in a growing list of honors, he is recognized as the middleweight champion by the International Boxing Federation (IBF) and other boxing organizations. Plaintiff America Presents, Ltd. (America Presents) promotes boxers and boxing matches.

In December 1996, the parties entered into a promotional rights agreement in which Hopkins granted America Presents exclusive rights to stage, sell tickets for and market all of his professional boxing engagements for a two-year term. America Presents agreed to offer Hopkins the right to participate in a minimum of eight boxing matches with stated minimum purses. Hopkins agreed to cooperate and assist in pursuing the objectives of the contract.

Their ensuing relationship was fractious. On February 23, 1999, America Presents seized the initiative by filing a complaint against Hopkins claiming, not breach of contract, but rather disparagement of America Presents' services and business in violation of a Colorado statute, and inter-ference with America Presents' continuing and prospective business relationships. This complaint was soon withdrawn and an amended complaint was filed based on breach of contract. Hopkins filed an answer and counterclaim for breach of contract, breach of fiduciary duty and duty of good faith, and tortious interference with prospective business advantage. As a matter of law, I ruled that a fiduciary relationship did not exist.[1]

The case came on for retrial on January 16, 2001. A previous trial to a jury, which began August 21, 2000, had ended in a mistrial after eight days when the jury was unable to reach unanimous verdicts. For reasons I will explain later in this opinion, America Presents did not appear by counsel for the retrial. When the case was called, Hopkins waived his right to a jury trial and moved to dismiss America Presents' complaint. I accepted the waiver and granted that motion.

Hopkins moved for judicial notice and consideration of the evidence presented to the jury during the original trial. I granted that motion. Hopkins testified in his own behalf and rested his case. Preparation of a transcript of the entire aborted trial, including America Presents evidence and its cross-examination of Hopkins' witnesses, was ordered. Thereafter new counsel entered his appearance on behalf of America Presents and was permitted to file post-trial motions, proposed findings and objections to Hopkins' proposed findings.

## BACKGROUND.

Most of the revenue for today's boxing industry comes from television. Boxing is

---

1. *See Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 769 (S.D.N.Y.1990)(absent exceptional circumstances [not present in this case], where the existence of a fiduciary relationship is predicated upon nothing more than the professional relationship existing be-tween boxer and promoter defined by an exclusive promotional agreement, there is no reason not to be guided by the general rule that such commercial arrangements create no fiduciary duties distinct from a requirement of good faith performance).

telecast on both network and pay per view channels. Home Box Office (HBO) is the premier boxing broadcaster. It produces three programs: TVKO, HBO CHAMPIONSHIP BOXING (HBO–I), and HBO BOXING AFTER DARK. Other producers include the national networks, ABC, NBC, CBS and FOX along with ESPN, USA Cable, SHOWTIME and FOX Sports Net. The prices these organizations pay to broadcast fights are subject to numerous factors determined to a great extent by revenue received from advertisers and subscriptions for pay per view.

A significant price consideration is the "star quality" of the boxers. Generally speaking, the producer with the highest viewer participation has the greatest revenue and is thus able to pay the most to the best boxers and their promoters for broadcast rights. HBO is in the catbird seat in this regard and its premier program, "HBO I," presents boxers with the greatest star quality.

One of the very top stars, indeed a celebrity or superstar, who has boxed in various weight divisions is Roy Jones. Challenging Roy Jones in a championship fight is highly desirable both for the money and the prestige. Defeating Roy Jones in a title match practically assures the victor of star status.

Even more so than with other professional sports, boxing has little room for losers. Because boxing is a very dangerous sport with grave risk of injury and perhaps the most physically demanding of all highly competitive sports, the time during which a fighter can be at the top of his game is highly restricted. With very few exceptions, a boxer's professional career is over before age forty. Additionally, because the sport requires recuperation after a fight and demands rigorous training and conditioning in preparation for each event, the number of boxing matches in which a fighter may engage is finite.

Success as a boxer is limited not only by physical ability, talent and stamina, but also by time, opportunity and fortune. What may otherwise seem to be enormous amounts of money paid to boxers for a single event, must be viewed in the context of a highly risky and short professional life coupled with the lengthy and intense demands of training and physical discipline.

Providing a boxer with opportunities to fight for both financial profit and career enhancement is the promoter's job. Though specific contracts may differ from the customary practice in the industry, the promoter usually advances training expenses and incurs other promotional costs, not the least of which are for travel, publicity and accommodations. If the fighter loses, the promoter earns much less or loses its investment entirely and the prospects for that fighter are almost always significantly diminished. Fight promotion is a high-risk business.

Unlike the fighter, however, the promoter is not limited to a single career. It is standard for a promoter to have a number of fighters under contract and most promotional rights agreements, including the instant one, contain a declaration that the promoter is free to engage in promotional activities for other fighters including those in competition with the fighter under contract. Unless specifically provided to the contrary, a promoter has no obligation to secure any particular bout with any other particular boxer. Obviously, the better the fighters under contract are, the better the promoter's chances are for financial and long-term success.

The IBF is one of several private membership organizations formed to regulate and sanction world championship professional boxing. The IBF, WBC (World Boxing Council) and WBA (World Boxing Association) are the three leading organizations in this arena. Each has its own

"world champion" in each of approximately 10 weight divisions. Thus, there can be more than one "world champion" in each weight division at any given time.

Each champion is awarded a belt. If a boxer is awarded a belt from each organization, he is said to be the undisputed world champion. The process by which a boxer achieves that distinction is called unification. Losing a belt or being stripped of a belt are colloquial terms meaning that the boxer has lost his championship status with the particular organization.

Under IBF rules, a title holder may fight in either optional or mandatory title defense bouts. For optional title defense bouts, the champion and his promoter can choose the opponent from the IBF's list of the top 12 ranked fighters. For mandatory title defense bouts, the IBF requires the reigning champion to defend his title in a match against the number one or leading available contender approximately every nine months. If a champion fails or refuses to participate in a mandatory bout, the organization can strip him of his belt and declare the world title position open.

The weight limits for the boxers in this controversy are middleweight, super middleweight and light heavyweight. Weight is determined shortly before a bout. At the weigh-in for championship bouts, a middleweight boxer may weigh no more than 160 pounds, a super middleweight may weigh no more than 168 pounds and a light heavyweight may weigh no more than 175 pounds. A boxer may be a champion in a higher weight division, but the converse is not true. For example, a middleweight may compete for the super middleweight title, but a light heavyweight may not. Given the superb physical condition of most championship level boxers and the force with which blows are struck, weight is a critical factor.

When the champion and his promoter cannot reach agreement with the selected contender and his manager over who will promote the fight or how much each will be paid, either party may request the IBF to hold a "purse bid." [2] If negotiations are not completed within a prescribed period, the IBF may require a purse bid. The purse bid is open to any registered promoter. The right to promote a purse bid fight can be sold to another qualified promoter. A sealed bid auction is held and the IBF designates the promoter who is the highest qualified bidder to promote the particular fight. The purse, or proceeds from the fight, is divided according to a formula with the champion receiving 75% of the total bid and the challenger receiving 25%. *See Schulz,* 105 F.3d at 133, n. 12 (citing IBF Rule 23, App. 285).

### THE EXCLUSIVE PROMOTION AGREEMENT.

On December 19, 1996, America Presents and Hopkins executed a promotional rights agreement (the Agreement). Hopkins granted America Presents the right to promote all professional boxing contests engaged in by Hopkins during the term of the Agreement and any extension thereof. In consideration, America Presents obligated itself to offer Hopkins the right to participate in a minimum of eight specified bouts: *viz.,*

(A) A bout televised by ABC, CBS, NBC, or Fox Television with Hopkins guaranteed a minimum purse of $100,000.

---

**2.** "Purse bid" is a term of art used in the boxing industry. *See Schulz v. United States Boxing Ass'n,* 105 F.3d 127, 133 n. 12 (3rd Cir.1997). Although the purse split between a champion and a challenger is usually negotiated, if the parties cannot agree the IBF holds a "purse bid."

(B) A bout televised by HBO I with Hopkins guaranteed a minimum purse of $500,000.

(C) A bout televised by HBO After Dark with Hopkins guaranteed a minimum purse of $250,000.

(D) A bout televised by ESPN, USA Cable, FOX Sports Net or comparable broadcast coverage with Hopkins guaranteed a minimum purse of $65,000.

(E) A guaranty by America Presents that Hopkins would participate in either one HBO I bout or two HBO After Dark bouts each year.

America Presents retained discretion to select the date and site for each bout, subject to Hopkins' reasonable approval. The opponent for each bout would likewise be selected by America Presents, but subject to both Hopkins' reasonable right of approval *and* the approval of the applicable commission and/or championship sanctioning body.

The Agreement provided that in any legal action brought relating to its provisions or any default thereunder, the losing party would reimburse the successful party for the reasonable attorney fees and disbursements incurred in the litigation. It further provided that Hopkins would receive a minimum purse of $1,000,000 if he fought a championship bout against Roy Jones.

Although the Agreement was signed on December 19, 1996, the terms relating to its effective date are ambiguous. On October 16, 1992, Hopkins had entered an exclusive promotional agreement with B. Lewis Productions, Inc. (the "Lewis Contract"). Butch Lewis, the principal of B. Lewis Productions, had filed an action against Hopkins relating to that agreement in the New York state courts and that action had been dismissed. Because of Lewis's continuing claims—which Hopkins considered spurious but nevertheless troublesome—Hopkins had instituted a declaratory judgment action in the United States District Court for the Eastern District of Pennsylvania seeking a declaration that the Lewis Contract had expired as of December 4, 1996.

These details were set forth in the preamble to the Agreement and identified as "the Litigation." The recital concluded as follows: "Accordingly, all parties acknowledge that their respective obligations as set forth within this Agreement is (*sic*) subject to conclusion of the Litigation confirming Fighter's ability to perform under this Agreement." Read literally, the statement is nonsensical. A declaratory judgment involving another party could neither confirm nor negate the ability of the "Fighter" to perform under the instant agreement. At best a favorable declaration might instill a sense of well-being in these parties that further interference from Lewis would be unlikely.

The parties, of course, could have agreed that the effective date upon which the term of their contract was to be calculated would be triggered by some external event, but that is not what they provided nor how they acted. Given the ambiguity, I look to the other parts of the Agreement to see if the meaning and intent of the parties can be discovered. As discussed in greater detail below, I also look to the parties' conduct as an indication of how they interpreted the Agreement during its brief existence rather than in the *post hoc* litigation.

Section 2 in the body of the Agreement states: "(a) the term of this Agreement (the "Term") shall commence following conclusion of the Litigation in favor of Fighter, or any other settlement permitting Fighter to perform the obligations contemplated under this Agreement, and continue for two years, *through 31 December 1998*, unless terminated sooner pursuant to the terms of this Agreement." (Emphasis added.)

The term of the Agreement is further muddled by recitations regarding payment of a $25,000 signing bonus and advance payment of $25,000 for training expenses, the former to be "remitted" immediately upon successful conclusion of the Litigation and the latter to be held "in escrow" by Hopkins' attorney in order to enable Hopkins "to train and maintain a livelihood following the conclusion of such Litigation."

The parties soon began wrangling about the meaning of the Agreement and on January 30, 1998 negotiated an Amendment providing that the Agreement was to commence on June 7, 1997 and expire on June 30, 1999. Paragraph 3(e) of the Agreement was amended to read: "Promoter guarantees that fighter shall participate in either one (1) HBO I Bout or two (2) HBO After Dark bouts per *contract* year." (Emphasis added.)

Three more paragraphs were added:

3(f): "Promoter shall remit to and guarantee Fighter a monthly stipend of $3,100 commencing January 1998 and continuing through December, 1998, regardless of the duration of this Agreement."

3(g): For each of the first two (2) Championship Title Defense Bouts immediately following the contemplated Championship Title Defense against Simon Brown scheduled to take place on January 31, 1998, Fighter shall receive $40,000 over the minimum purse amounts otherwise set forth in Paragraph 3(a-d) above.

3 (h): "Promoter shall advance to Fighter $100,000 prior to end of the first week in January 1998, which amount shall be applied against the purse due to Fighter for the January 31, 1998 Championship Title Defense against Simon Brown."

In sum, the parties agreed to an amended two-year promotional contract beginning on June 7, 1997 and ending on June 30, 1999. A further unamended provision of the Agreement related to extension of its term. If a bout promoted under the Agreement were postponed for any reason provided in the relevant bout agreement, the term would be extended automatically for the period of such postponement and a reasonable training period not to exceed six weeks thereafter. In considering this provision, it is necessary to bear in mind that if a boxer is injured, the period of postponement is usually set by the sanctioning organizations from the date of the injury until the boxer is medically cleared to return to the ring.

Of the eight bouts America Presents promised to offer Hopkins during the contract term subject to his reasonable right of approval, it guaranteed that from June 7, 1997 to June 30, 1998 he would participate in either one HBO I bout or two HBO After Dark bouts, and that from July 17, 1998 to June 30, 1999 Hopkins would again participate in either one HBO I or two HBO After Dark bouts. America Presents made the guaranty without first confirming that HBO would televise such bouts. As will be described below, America Presents failed to meet its obligations under the Agreement. Because some offers were made that did not receive Hopkins' approval, the issue with respect to each is whether his exercise of his right of approval was reasonable. I conclude that in each case it was.

Hopkins' obligations were to allow America Presents to be his promoter and thus participate in receiving financial benefits from the bouts, and to cooperate with the promotion of those bouts in which he agreed to participate. Hopkins performed all of his obligations under the Agreement and was ready, willing and able to participate in the contemplated eight bouts during its term.

## CHRONOLOGY.

### 1996

On April 17, 1995 Hopkins became the IBF middleweight champion. In the Fall of 1996 HBO offered Butch Lewis, Hopkins' promoter at the time, $1.5 billion for a Hopkins/Roy Jones bout which Hopkins rejected. The basis for his rejection was that Lewis wanted to retain two-thirds of the amount for himself, pay Hopkins $500,000 and extend his promotion contract. Thus, in the negotiations relative to the instant Agreement, Hopkins insisted that in any fight with Roy Jones he would receive a minimum of $1 million.

In a December 8, 1996 memorandum letter, Eric Bottjer, an employee of America Presents, wrote, "Our goal for Bernard will be to make him the premier fighter in his division and put him in a financial position where he can retire in four years a millionaire, if he wishes. That will be accomplished by having Bernard fight on national TV as a headliner, by having Bernard clean out the division of any viable contenders, by having Bernard unify the middleweight title, if Don King's paper champions are up to the task."

At the time the Agreement was signed, the parties contemplated Hopkins would retain his IBF middleweight championship. Subparagraphs 4 and 5 specifically provide that the bouts America Presents was to offer Hopkins for his approval would have to be acceptable to the official sanctioning body recognizing his title.

The principals signed the Promotion Agreement on December 19. By the end of the month, America Presents had paid Hopkins $25,000, written one letter to the IBF about Hopkins' April 1997 mandatory fight with John David Johnson, and written a second letter to the IBF requesting a January 11, 1997, bout with Brian Barbossa.

### 1997

From January through June 1997, America Presents assisted Hopkins in his legal case against Lewis Productions and prompted the IBF and promoter Don King to complete the pending arrangements for Hopkins' bout with John David Jackson. In April Hopkins defeated Jackson in his mandatory IBF fight. Hopkins was paid $150,000 out of a purse bid by Don King. On June 7, the litigation with Lewis Productions was successfully concluded and America Presents paid Hopkins $25,000.

The first match promoted by America Presents occurred on July 20, 1997, in Indio, California, with Glen Johnson. Hopkins successfully defended his title. CBS televised. America Presents represented both Hopkins and Johnson. The bout agreement did not contain a return bout clause. Hopkins received $100,000 and cooperated fully in promoting the fight. America Presents asserts it lost $70,000 on this bout.

At some point in the fall of 1997, HBO offered America Presents $1.3 million for a Hopkins–Roy Jones fight. America Presents rejected this offer without advising Hopkins that it had been made, stating for its reason that the amount offered was too low. On October 23 America Presents requested an extension of a mandatory IBF obligation so that Hopkins could fight Simon Brown on January 31, 1998. On November 18, in a bout promoted by Don King and televised via USA Network, Hopkins defeated Andrew Council and received the contract minimum of $65,000. America Presents obtained an option to co-promote with Don King Andrew Council's next fight had he defeated Hopkins.[3]

---

**3.** Even though that eventuality never came to pass, the inclusion of the provision is significant because it is a decided advantage for the

Hopkins fully cooperated in the promotion of this fight. America Presents asserts it lost $75,000 on this bout.

### 1998

On January 30, America Presents and Hopkins signed the Amendment to the Agreement. The next night, January 31, Hopkins defeated Simon Brown. The contract for this match did not contain a return bout clause. Had Brown defeated Hopkins, America Presents would have had options on Brown's next three fights. HBO After Dark televised the fight for $250,000 and Hopkins was paid the purse amount. America Presents claims it lost $62,802 on this fight. Hopkins participated fully in the promotion of the event.

Simon Brown had been an optional title defense and Hopkins was faced with a mandatory obligation to fight the number one ranked IBF contender, Robert Allen. Despite its awareness of this obligation, America Presents had sought the optional defense and Hopkins, not for the first time, advised that he did not want to risk losing his championship belt by failing to meet the mandatory requirement. America Presents tried to convince Hopkins to fight Antwon Echols instead of having the mandatory match against Allen. On February 12 the IBF reminded America Presents that Hopkins' next bout must be a mandatory defense of his title. America Presents did not advise Hopkins of this reminder.

In the same month, America Presents and Allen's promoter, Don King, negotiated, but did not finalize, an agreement for King to sell America Presents the right to promote the mandatory bout. The sale did not take place. It was not until March that Hopkins learned from the IBF of his obligation to fight Allen. The bout was to have taken place on April 4, 1998, but America Presents rescinded its offer to King to buy the promotion rights. Hopkins was never advised of the potential contract.

The proposed sale of promotional rights from King to America Presents provided that, among other consideration, if Hopkins defeated Allen, America Presents would pay King $50,000 immediately after Hopkins' next bout. Moreover, America Presents was unable to negotiate an option to promote Allen's next fight if Hopkins lost to him.

On March 2, America Presents sent Hopkins a copy of a letter it had purportedly sent to the IBF advising that Allen was injured and could not participate in the mandatory fight with Hopkins. The original of that letter was never sent to the IBF. America Presents' CEO, Dan Goossen, advised Hopkins that King and Allen were trying to jeopardize Hopkins' standing with the IBF, that America Presents was lobbying on Hopkins' behalf, and that if Hopkins was stripped of his IBF belt America Presents would support him. On the same day that America Presents sent Hopkins a copy of the undelivered letter to the IBF, it faxed a letter to the IBF requesting a purse bid for the Allen fight. Hopkins did not receive a copy of the purse bid fax.

While these letters were being sent and not sent, America Presents was rescinding its offer to King for the April 4 Hopkins/Allen match and negotiating with Art Pelullo, Antwon Echols' promoter, for a Hopkins/Echols fight on the same April 4 date. Had Hopkins accepted the Echols offer, America Presents would have obtained options to promote future fights of Echols and would not have had to pay Pelullo anything, unlike its obligation to pay Don King in the event of a Hopkins victory.

promoter that bolsters the security of its investment.

Hopkins declined the Echols proposal without any knowledge of the foregoing. He did so, however, because he would have lost his IBF championship by not meeting his mandatory obligation to fight Allen.

Without informing Hopkins of yet another offer by King for a May 1998 Hopkins/Allen fight that would have satisfied Hopkins' mandatory obligation, America Presents rejected that offer. Instead, America Presents offered Hopkins a fight with Reggie Johnson, a light heavyweight. America Presents did not advise Hopkins that Johnson was scheduled to fight someone else on May 29, that Johnson was hurt before or during the fight, or that Johnson had his own mandatory fight to satisfy on August 6. The proposal was that if Hopkins defeated Johnson, he would go on to fight Roy Jones in an HBO I event and receive $1 million. The fight with Johnson would pay Hopkins $500,000. Hopkins refused the deal for three reasons: He wanted to proceed with the mandatory title bout with Robert Allen, he wanted to retain his title, and he wanted more money. There is also some indication that Hopkins was concerned about the weight difference with Johnson, but this does not appear to have been a deciding factor.

Hopkins wrote directly to the IBF, Don King was able to obtain a continuance of the Allen fight, and the bout was eventually held on August 28 in Las Vegas. In the fourth round, Hopkins suffered a sprained ankle and was unable to continue. No decision was awarded to either fighter as the rules required at least four rounds to be completed. Promoter Don King received the purse and both Hopkins and Allen were paid.

On September 1, America Presents offered Hopkins a fight against Frank Liles to be held on October 24. America Presents did not advise Hopkins that Liles was injured and unable to fight, that Liles would be paid more than Hopkins, or that Liles would be promoted by America Presents and America Presents would receive options on future Liles matches. IBF approval would be required for Hopkins to participate in an interim bout before the rematch with Allen. Hopkins rejected the Liles offer because he was still under the IBF mandate to fight Allen.

At the time America Presents made both the Johnson and the Liles offers to Hopkins, neither fighter was physically capable of participating in a boxing match with anyone on the dates proposed. The Johnson bout was to take place in the summer or fall of 1998, but Johnson was injured in a bout on May 29 and did not participate in another fight until the following year. The Liles offer was scheduled for October, but he was injured and had surgery in June and was unable to fight for the rest of the year. America Presents was fully aware of Liles' incapacity at the time it made the offer to Hopkins.

On September 19, the IBF allowed Allen to fight an interim bout. America Presents neither objected to the interim bout on Hopkins' behalf nor lobbied the IBF to permit a similar interim bout for Hopkins. On October 1 Hopkins had sufficiently recovered from his injuries to resume training and to fight as early as mid-October. On December 7, Hopkins sought a release from the Agreement on the grounds that America Presents could not possibly secure the four bouts promised by June 30, 1999 and it did not protect Hopkins from the IBF sanctions regarding the mandatory Allen match.

### 1999

The rematch with Allen (Allen II) was held on February 6, 1999. Hopkins convincingly defeated Allen in what was to have been an America Presents promotion secured by a purse bid of $300,000, but

which America Presents sold to Don King for a $75,000 profit. The fight was broadcast on Showtime. America Presents refused to pay Hopkins the $40,000 it admittedly owed him for the Allen II fight. To this date, America Presents has never paid this sum nor has it ever denied owing it.

On February 23, 1999 America Presents filed this suit against Hopkins. In April, through counsel, Hopkins advised America Presents that he was ready, willing and able to participate in any bout promoted by America Presents occurring before June 30. On May 7, America Presents offered Hopkins a fight for July 7 against an unranked boxer named Irribarren. America Presents claims it offered Hopkins a fight against the winner of an Irribarren/Vanderpool match, but no written record of such an offer exists and Hopkins denies ever receiving it. Neither of these offers were for fights that would have taken place during the term of the Agreement.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW.

### 1. *Breach of Contract.*

■ To establish a breach of contract under Colorado law, a party must prove the existence of a contract, the performance or justification for nonperformance by the party seeking to uphold the contract, and the other party's failure to perform. *See Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1057–58 (Colo. 1992).

■ Though his burden is only that of a preponderance of evidence, Hopkins has established clearly and convincingly that he and America Presents entered into a valid and enforceable contract that obligated America Presents to offer Hopkins and promote eight boxing matches—some of which had to be televised by HBO for certain minimum amounts—and to pay

Hopkins for participating in these bouts. America Presents failed to provide Hopkins with five of the required eight bouts and failed, without any justification or excuse, to remit to Hopkins the $40,000 payment it was obligated to pay him under the Agreement.

Matthew Tinley, the founder and CEO of America Presents, testified that he did not participate in negotiating or drafting the Agreement or any of its specific provisions, but left the details to Goossen and Jeffrey Fried, America Presents' general counsel, who consulted by telephone with Goossen from time to time during the negotiations and drafting.

Tinley and his wife hosted a Christmas party in Denver near the time of the negotiations in December 1996, which Hopkins attended. (Hopkins emphatically denies attending any such party and has no recollection of it, but I find he is clearly in error. His presence was convincingly established by the testimony of Mrs. Tinley.) Tinley recalls having a conversation with Hopkins at the party, the focus of which was the expression of Hopkins' passionate desire to fight Roy Jones and Tinley's assurance that such a fight and consequent stardom for Hopkins was just what America Presents planned to provide.

Tinley testified that America Presents did not make a profit during 1996, 1997, 1998 and 1999. He asserted "that Mr. Hopkins is partially responsible for some of those losses because he didn't honor his commitments, and he didn't follow the plan that would have allowed us (i.e., America Presents) to recoup our investments." The objectives of the Agreement, however, were precisely as stated therein. Assisting in the recoupment of America Presents' investment is not one of them.

I find Tinley credible. I conclude his admitted lack of familiarity with the Agreement, his absence from its negotia-

tion and drafting phase and his lack of supervision over the acts of Goossen contributed to the failure of America Presents to comply with the terms of the Agreement and to pursue instead a failed plan or course of conduct to recoup its investments.

On the contrary, I find Goossen is not credible. On critical events and even regarding his own established acts, he testified that he had no recollection. For example, he could not recall whether he conveyed specific offers of bouts to Hopkins' representatives and relied instead on what he described as his usual business practices. Hopkins' representatives, however, clearly stated that Goossen never mentioned these offers. Such specific testimony trumps Goossen's general practice rhetoric.

Goossen had no explanation for why he mailed Hopkins a copy of his March 2, 1998 letter to the IBF advising of Allen's purported injury but stamped the original of the letter "Not Sent" and placed it in the company files. Repeated reviews of his extensive testimony disclose a medley of unresponsive answers, evasions, equivocations, invocations of his own qualities of character, and unsolicited comments even on direct examination.

I find Hopkins performed all of his obligations under the Agreement and was at all times ready, willing and able to perform in bouts that might have been scheduled. I find his exercise of the right to approve or reject fight proposals under the Agreement was reasonable in each instance.

In the post-trial arguments and proposed findings, without citing any authority, America Presents insists that Hopkins' exercise of his reasonable right of approval must be in furtherance of the objectives of the Agreement. Such a restriction would make the right meaningless. Even if that were the case, however, an integral element of the Agreement is Hopkins' recited championship status. Indeed, if Hopkins were not a champion at the time the Agreement was executed, none of its terms would have made sense, including America Presents' right to terminate the Agreement if Hopkins lost a bout.

One of America Presents' own witnesses, fight promoter Cedric Kushner, testified that Hopkins was not unreasonable. He also testified that in his opinion, America Presents' proposals to Hopkins were not unreasonable because the only test of reasonableness was what made money. From a promoter's viewpoint, as Tinley stated, the criteria for reasonableness are recouping an investment and realizing a profit. It is, however, the reasonableness of Hopkins' rejection or approval that is at issue—not whether the offers made by America Presents were reasonable from its coign of vantage.

America Presents argues in its post-trial submissions that Hopkins' withholdings of approval were *"per se* unreasonable." There is no such thing. What is reasonable or not in a course of conduct is the result of a process of ratiocination that must be evaluated in the discrete circumstances of a given case. "Reasonable" means capable of being objectively stated in terms others can understand; it is not a synonym for "agreeable."

At the time the Agreement was executed, America Presents was fully cognizant that Hopkins had already turned down an offer to fight Roy Jones when his then-promoter, Lewis Productions, wanted to retain two-thirds of the $1.5 million HBO was offering and require Hopkins to extend the term of the promotion contract. Two points emerge from that knowledge. First, it was reasonable for Hopkins to withhold approval when his promoter sought a disproportionate percentage of the proceeds and a significant modification of the contract terms. Second, America

Presents fully understood why Hopkins insisted that he must receive a minimum of $1 million from any Roy Jones bout televised by HBO.

As this provision was placed in the Agreement to put any similar controversy to rest, America Presents was also fully advised that Hopkins had previously exercised a reasonable right of refusal in his own interest. There was no reason for America Presents to suppose that Hopkins would treat the reasonable right of approval in the Agreement differently.

In each instance in which Hopkins declined to approve offered bouts, he based his decision on the unnecessary risks of losing his championship status such fights would present. It is not unreasonable for a champion boxer to refuse bouts that could result in the sanction of having his belt stripped, no matter how much money is left on the table. I am not persuaded that decisions based on a desire to protect one's status, record and legacy are unreasonable merely because there is a possibly more profitable path one might take. Hopkins' world championship was and is a reality and he was well on his way to achieving unification of the various titles.

It was not unreasonable under the circumstances for Hopkins to protect what he had, even if his decision adversely affected America Presents' opportunities to recoup its investment. At all times, America Presents was fully aware of Hopkins' efforts and desires to unify his title and that he would do whatever was necessary to preserve his IBF middleweight crown.

2. *Hopkins' Counterclaim for Intentional Interference With Prospective Business Advantage.*

■ Colorado recognizes the tort of intentional interference with a prospective business relation as defined in the Restatement (Second) of Torts § 766B (1979). *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 500 (Colo.1995)(citing *Dolton v. Capitol Fed.*

*Sav. & Loan Ass'n,* 642 P.2d 21, 23 (Colo. App.1981)). Section 766B of the Restatement provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation. Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract.

*See Dolton,* 642 P.2d at 23. Hopkins' counterclaim against America Presents would require that he prove the existence of a prospective contractual relationship with a third party (HBO) to promote or schedule a boxing contest, intentional and improper interference with that relationship by America Presents causing HBO or Hopkins not to enter into that relationship, and demonstrable financial loss as a result. The established facts simply do not fit within this legal paradigm.

The basis of Hopkins' claim for tortious interference is HBO having advised Goossen of its desire to have two contracts with Hopkins for bouts against Roy Jones and David Reid on dates certain for specified amounts. Hopkins is persuasive that Goossen rejected these offers and failed to communicate them to Hopkins because such offers were not in America Presents' best financial interests. In other words, America Presents was not interested in pursuing negotiations or finalizing bout agreements with Jones or Reid according to the offers made in spite of its obligation

under the Agreement to communicate them to Hopkins.

Obviously, the failures to communicate the offers to Hopkins constitute breaches of the Agreement, and of the implied covenant of good faith present in all contracts under Colorado law. Any bout agreements, however, would have been made in furtherance of the Agreement to which America Presents was a party and pursuant to duties already existing in contract under that Agreement. The tort of wrongful interference with prospective business advantage does not encompass a business advantage in which the alleged tortfeasor is already a prospective participant or regarding which the alleged tortfeasor already has contractual duties. Hopkins' remedy is to be found in contract and not in tort. *See generally Town of Alma v. Azco Constr., Inc.,* 10 P.3d 1256 (Colo.2000)(discussing economic loss rule and holding that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care in tort).

### 3. *Damages.*

I find Hopkins to have been damaged by America Presents' several breaches of their Agreement in the total amount of $1,790,000. The Amendment to the Agreement provided that America Presents was to pay Hopkins $40,000 after his first two title defense bouts following the Simon Brown fight. This amount is in addition to whatever amounts Hopkins would receive for his participation in those bouts. America Presents has failed and continues to fail to pay this amount even though it is due and owing.

The only three bouts offered during the term of the Agreement by America Presents that were approved by Hopkins and by the IBF were those against Glenn Johnson, Andrew Council and Simon Brown. The only HBO bout took place on January 31, 1998 against Simon Brown. It was televised on HBO AFTER DARK and Hopkins was paid $250,000. At all times incident to the Agreement, except for the contemplated recuperation period following the Allen I fight, Hopkins was ready, willing and able to participate in the eight bouts that America Presents was obligated to provide.

The Agreement provided that if Hopkins fought Roy Jones, America Presents guaranteed Hopkins a minimum of $1 million. HBO's offers to America Presents to that effect were not communicated to Hopkins. Such bouts could have taken place in 1997, 1998 or 1999. Specific dates and purses were offered. America Presents' failure to communicate these offers to Hopkins bars it from denying its guaranty.

America Presents failed in its obligations to provide either two HBO AFTER DARK events or one HBO I fight at a minimum per contract year. HBO I would have a minimum purse of $500,000. HBO AFTER DARK would have a minimum purse of $250,000. Hopkins participated in only one HBO AFTER DARK event against Simon Brown, on January 31, 1998. The contract years ran to June 1997, June 1998 and June 1999. The total for the three years due and owing to Hopkins is $1.5 million less the $250,000 received, for a $1,250,000 total under this provision. Had one of those fights been against Roy Jones, however, it would have taken place without doubt on HBO I and Hopkins would have received a minimum of $1 million rather than the contract minimum of $500,000. Thus Hopkins is entitled to recover $1 million for one year of the contract, $500,000 for the year in which a Roy Jones fight did not take place, and $250,000 for the year in which he was paid for the Simon Brown fight, or a total of $1,750,000 plus the $40,000 withheld with-

out any justification for a total of $1,790,000.

Hopkins has claimed additional amounts for other bouts he would have accepted, but they either were not contemplated by the Agreement or are otherwise too speculative to justify an award of damages. It is likewise speculative to award Hopkins damages on his claim for tortious interference with prospective business advantage, even if that claim were viable. This claim is based on America Presents' failure to inform Hopkins of bout opportunities against Roy Jones and David Reid. Hopkins urges that had he won either bout, in all likelihood he would have been offered a long-term contract with HBO similar to ones offered to Roy Jones. Those possibilities are laden with uncertainty, as distinguished from the clarity of America Presents' several failures to meet its obligations under the Agreement.

## AMERICA PRESENTS' FAILURE TO APPEAR AT TRIAL.

On January 9, 2001, a mere seven days before the retrial of this case was to begin, America Presents' former counsel moved to withdraw, citing his client's failure to pay for work that had been performed, its refusal to provide funds for representation leading up to and including the retrial, and its refusal to assist him in representing America Presents or preparing for the retrial. Because a motion to withdraw presented that close to a trial date is fraught with problems, I set the motion for forthwith hearing.

The hearing was held on Thursday, January 11, 2001. The retrial was set to commence the following Tuesday, after the Martin Luther King holiday. Present were the moving attorney, Charles Casteel, the general counsel of America Presents, Jeffrey Fried, counsel for Defendant Hopkins, Arnold Joseph, Goossen, Tinley, and others.

At the hearing, Casteel described, with considerable discomfort given his continuing duties of loyalty, the impasse he had reached with his client, which appeared to have originated with his efforts to collect not only payment for his work on the first trial in August 2000, but to secure a retainer for work necessary to prepare for the retrial. According to Casteel, it was not until collection efforts intensified that he began hearing complaints about his performance, which had been roundly complimented before then. *See* Rep. Tr. on Mot. Withdraw (dated 1/11/01) at pp. 3–4.

In addition, however, it became clear that the issues between attorney and client transcended the matter of payment, extending to a profound disintegration of the attorney-client relationship. The communication issues, specifically including America Presents' refusal to communicate with Casteel regarding the status of settlement negotiations with Hopkins brokered by someone other than Casteel, left Casteel in a situation he described as having been completely precluded from preparing for the retrial. Tr. at 4–5. Simply put, Casteel could not move forward with the retrial because he had not been able to—and likely had been instructed not to—prepare. *See id.* at p. 5 (where Casteel states "I have not prepared for trial because of the representations that have been made").

Responding on behalf of America Presents, Fried declined specifically to address the refusal to communicate with Casteel, but admitted payment issues had hampered the relationship. Fried acknowledged performance critiques and payment issues had become "meshed," Tr. at 6, but likened the critique to "sit[ting] down with a boxer with whom we have a promotional agreement and had a performance in the ring, that I might have felt was subpar ... and voice my concerns."

*Id.* at 7. I found the analogy disingenuous under the circumstances presented. Fried also elaborated on the settlement negotiations, stating negotiations had been ongoing until two weeks before the retrial, with Lou DiBella, an HBO representative and witness in the original trial, "sort of broker[ing] and representing Bernard Hopkins in settling the case." Tr. at 8. Negotiations had evolved to the point that documents had been prepared, but settlement ultimately fell apart. *Id.* Reading between the lines, I interpreted Fried's statements to confirm that Casteel was being kept in the dark and had probably been instructed not to incur expenses or spend time preparing for trial because settlement was imminent.

Citing his "discomfort" with Casteel's continued representation, Fried joined in the Motion to Withdraw, stating he had already approached other law firms about taking over representation for America Presents, and suggesting one of the firms could be prepared to proceed with the retrial in "four to six months." Tr. at 8.

Before ruling, I asked Joseph for Hopkins' position on the Motion to Withdraw. According to Joseph, he was caught completely off-guard by Fried's suggestion of a four to six month continuance, stating this was the "first time I'm hearing any of this." Hg. Tr. at 9. When settlement fell apart, Joseph said Fried represented America Presents "had counsel on board" and led him to believe "we would be going forward [with the retrial] on Tuesday." Hg. Tr. at 10. Joseph stated Hopkins had spent a lot of money getting him prepared to proceed, he had prepared his witnesses, traveled to Denver, ordered transcripts, and he was now "ready to go." Tr. at 10. Joseph strongly objected to any continuance on grounds doing so would be "patently unfair." *Id.* According to Joseph, Hopkins had fights proposed for March or April which he might not have to fight if

this matter resolved itself as favorably as he expected it to at trial and Hopkins elected to retire on the proceeds. Tr. at 11.

Faced with a reality in which counsel, on the eve of retrial, was moving to withdraw because he had effectively been fired by his client weeks, if not months, before and had been instructed not to prepare, I granted the Motion to Withdraw. For reasons I elucidated on the record and elucidate further below, I declined Fried's "suggestion" for a continuance, finding the continuance would severely prejudice Mr. Hopkins and believing, as I now affirmatively state in these findings, that the "need" for a continuance was an exigency created entirely by America Presents' own conduct in undermining its counsel and playing fast and loose with the court.

The timing of the request for a continuance was deeply troubling. The payment issues, refusal to communicate with counsel, and "dissatisfaction" with counsel's performance had clearly reached a crescendo months before the request. America Presents was refusing to pay Casteel for his work on the first trial, refusing to pay a retainer for him to prepare for the second trial, cutting him out of communications, and perhaps even instructing him not to prepare for the retrial, but America Presents neither fired him nor notified the court of its lack of preparedness. Instead, it waited until settlement negotiations failed and Casteel had no choice but to withdraw. It joined in the withdrawal motion, and five days before the retrial was set to commence, "suggested" a continuance.

When I declined, America Presents expressed disbelief at the unfairness. The unfairness, in my view, is in the assumption that the opposing party and the court should be held hostage to the machinations of a party playing chicken with their time,

money and schedules. Had a continuance been sought as soon as America Presents reasonably knew it would not be prepared to proceed, I would have been able to reschedule the retrial in a manner that would have best accommodated my docket and the other cases and litigants on it, and could have prevented Hopkins and his counsel from incurring the significant expense of final trial preparation, including the hours of attorney time, preparation of transcripts, and travel by Hopkins and his counsel from the East Coast to Denver. America Presents' refusal to communicate with its counsel and its counsel's failure timely to communicate with the court, created a situation in which the continuance was intended to be forced on the court and on the opposing party, to the latter's substantial prejudice.

First, Hopkins was prepared and his counsel and witnesses were ready for trial. Second, Hopkins' counsel strongly objected to a continuance, stating that further delay was prejudicial to his client, that his client had already incurred considerable expense to be ready for this trial, and that his client had done nothing whatever to cause delay or interfere with America Presents' preparation. Third, he indicated that while eleventh-hour settlement negotiations had taken place and failed, he was led to believe America Presents prepared to proceed with the retrial as scheduled and would not have travelled to Denver otherwise. Fourth, given the nature of Hopkins' profession and his age, an eleventh-hour continuance of a trial that had already ended in a hung jury created prejudice to Hopkins unique to that of most litigants who are neither professional athletes nor boxers. Finally, the condition of my court docket was such that a continuance for four to six months would operate to the detriment of many other litigants besides Mr. Hopkins.[4] Continuing jury trials for a specified time such as five months is a luxury that is simply not available in this judicial district.

America Presents' dilemma in needing a continuance after essentially forcing its counsel off the case and misleading its opponent that it was prepared to proceed, when in fact it could not, was entirely of its own making. Because the continuance sought under the circumstances presented would operate to the severe prejudice of Hopkins, I exercised my discretion to reject it. I advised the parties that the retrial would proceed as scheduled. Noting that a corporation could not appear *pro se* and must be represented by counsel or face being held in default, *see Rowland v. California Men's Colony*, 506 U.S. 194, 201–202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993), I urged them to make another attempt to settle.

The trial commenced on January 16, 2001. Fried was present, but would not enter his appearance as counsel of record. No counsel appeared on behalf of America Presents. I allowed two of America Presents' officers to address the court. Goossen said America Presents would never have fired Casteel or agreed to his motion to withdraw if its officers thought a continuance would not be granted. I inquired whether anyone had told him or any other America Presents officer that a continuance would be granted and he replied in the negative, stating it had not occurred to

---

4. In order to preside over previously set matters, a delay would require at least ten and possibly more months due to some pending protracted and complex cases. It would be predictable that some one or more of these set cases on the docket would settle and a trial could be set on short notice, but in this instance nearly all the witnesses and counsel were from out of state, most were obligated to travel and be at various boxing venues at differing times, and such a short-notice setting would be difficult, if not impossible to obtain.

them. I advised that the corporate officers present could testify and be subject to cross-examination, but could not examine witnesses or make arguments on behalf of America Presents.

America Presents did not answer by counsel when called for trial. Hopkins waived a jury, moved to dismiss America Presents' complaint and presented an abbreviated case consisting of an opening statement, a motion to take judicial notice of the testimony and exhibits received at the aborted trial, conducted a brief direct examination of Hopkins, and rested. At the conclusion of the proceedings I granted Fried leave to address the court, which he did. Finding his statements to be a rehash of his position from the January 11 hearing on the Motion to Withdraw, I took the case under advisement. I obtained transcripts of the prior proceedings and copies of exhibits previously received. In an excess of caution, I permitted new counsel to appear in the case for America Presents and participate in all post-trial proceedings, including the right to propose findings of fact and conclusions of law.

## CONCLUSION.

A number of matters have delayed this decision. Some have been at the request of counsel for America Presents, but the primary delays have occurred because of my unease with certain post-trial events and other litigation concerning Hopkins that touched upon representations made to the court during the pendency of the case pre-trial. I was concerned that a fraud had been perpetrated on the court and that resolution of such a serious matter was my primary obligation. After carefully reviewing further post-trial briefs and numerous documents and transcripts concerning those matters, I resolved that the outcome of this case would not be any different and that no fraud had occurred. The final reason for delay is my own ill-ness which incapacitated me for nearly a year.

In sum, I find against America Presents and in favor of Hopkins on the parties' respective claims for breach of the Agreement. I find against Hopkins and in favor of America Presents on Hopkins' counterclaim for intentional interference with prospective business advantage. As damages for America Presents' breach of the Agreement, I award Hopkins the sum of $1,790,000.

In accordance with the express provisions of the Agreement, moreover, I find Hopkins is entitled as the successful party to recover his attorney fees and disbursements incurred in this litigation. *See Dennis I. Spencer Contractor, Inc. v. City of Aurora*, 884 P.2d 326 (Colo.1994)(en banc)(recognizing that parties may contractually agree to shift the general obligation to pay one's own attorney fees from the prevailing to the nonprevailing party in any dispute under the contract). The amount awarded Hopkins for his attorney fees and disbursements incurred in this litigation shall be determined as follows: Within thirty days from the date of this decision, Hopkins shall submit a particularized statement to America Presents consisting of the hours of attorney time billed to him for this litigation together with an itemization of disbursements made in connection with this litigation. Disbursements, as set forth in the Agreement, are not limited to so-called court costs authorized by statute. Instead, I find the parties' intent was to require the losing party to reimburse the successful party for all of its reasonable expenses. Within twenty days following submission of the particularized statement and itemization, America Presents shall either agree to the amounts requested and such amounts shall be added to the Judgment or serve upon Hopkins' counsel a particularized state-

ment as to which hours, rates and entry items are not admitted. If the parties are then unable to agree, Hopkins shall notify the Court. I will appoint a special master to determine the amounts, and the fees and costs of the special master shall be apportioned between the parties on the basis of the special master's recommendation.

Judgment shall enter accordingly.