Lou **DIBELLA** and Dibella Entertainment, Inc., Plaintiffs–Appellants–Cross–Appellees,

v.

Bernard **HOPKINS**, Defendant–Appellee–Cross–Appellant.

Docket Nos. 03–7012, 03–9095.

United States Court of Appeals, Second Circuit.

Argued Sept. 27, 2004.

Decided April 4, 2005.

Judd Burstein, New York, New York (Peter B. Schalk, Matthew G. DeOreo, Law Office of Judd Burstein, P.C., New York, New York, of counsel), for Plaintiffs–Appellants–Cross–Appellees.

Stephen A. Cozen, Philadelphia, Pennsylvania (Robert W. Hayes, Marlo Pagano–Kelleher, Cozen O'Connor, P.C., Philadelphia, Pennsylvania; Edward Hayum, New York, New York, of counsel), for Defendant–Appellee–Cross–Appellant.

Before: CARDAMONE, McLAUGHLIN, and WESLEY, Circuit Judges.

CARDAMONE, Circuit Judge.

Plaintiff Lou DiBella sued defendant Bernard Hopkins, a former business associate, for libel. DiBella alleged that Hopkins made four libelous statements about him. After a jury trial in the United States District Court for the Southern District of New York before Judge Denny Chin in November 2002, the plaintiff was awarded a substantial verdict based on one of Hopkins' libelous statements. DiBella appeals from the judgment of that award entered December 2, 2002, on the grounds that the jury did not find that Hopkins' other three statements were libelous. Defendant cross-appeals from the same judgment challenging several evidentiary rulings, the amount of compensatory and punitive damages awarded plaintiff, and the finding that one of the allegedly libelous statements actually amounted to libel. By its verdict, the jury confirmed the insightful truth that "he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed." William Shakespeare, Othello, act 3, sc. 3, l. 159–61 (W.J. Craig ed., Oxford Univ. Press 1928). For the reasons set forth below, we affirm.

## BACKGROUND

### A. The Business Relationship Between Plaintiff and Defendant

Plaintiff DiBella, a former executive with the cable network Home Box Office (HBO), was a "principal architect" of HBO's successful boxing programming. He is now the head of DiBella Entertainment, Inc., an independent boxing promotions and television packaging company. Defendant Hopkins is the current undisputed middleweight boxing champion of the world, holding titles from the International Boxing Federation (IBF), the World Boxing Association (WBA), and the World Boxing Conference (WBC).

DiBella began negotiations to terminate his employment contract with HBO in January 2000. On May 12, 2000 DiBella and HBO executed a final termination agreement. Under that agreement HBO agreed to give DiBella several HBO "dates" for broadcasting fights he arranged. Such dates are extremely valuable because appearing in a fight on HBO—a venue that gives a boxer signifi-

cant public exposure—is considered a pinnacle of success in the boxing world.

While DiBella was still with HBO, another HBO executive recommended that he put Hopkins (then the IBF middleweight champion) on the "undercard" of an upcoming middleweight fight between Roy Jones and Richard Hall. DiBella agreed and put Hopkins on the undercard, allowing Hopkins to fight on HBO immediately before the Jones–Hall "main event."

After signing Hopkins to the undercard, DiBella initiated discussions with him about representing and promoting Hopkins after DiBella left HBO. In February 2000 the parties concluded a handshake agreement. DiBella agreed to advise Hopkins and assist in marketing him. Hopkins agreed to pay DiBella $50,000 as an advance fee for services that DiBella was expected to perform once he left HBO. The jury found that the $50,000 fee was not in consideration of HBO's decision to put Hopkins on the Jones–Hall undercard. Moreover, senior executives at HBO—including HBO's senior counsel, general counsel, and the head of HBO Sports—were aware of DiBella's contacts with Hopkins and had no objection to them. In late March or early April 2000—while still an HBO employee—DiBella agreed to advance Hopkins a $30,000 interest-free loan to cover Hopkins' training expenses. HBO executives were also advised of this loan and did not object to it.

DiBella officially left HBO employment on May 12, 2000. Hopkins fought in the undercard fight on May 13 and defeated his opponent, Syd Vanderpool. Hopkins and his lawyer, Arnold Joseph, Esq., met with DiBella on May 19, 2000, at which time Hopkins repaid DiBella the $30,000 loan and prepared a check for $50,000 as payment to DiBella of the advance marketing fee. Issuance of the check was deferred because DiBella was a potential witness in a lawsuit pending in the United States District Court for the District of Colorado (Kane, J.), brought by Hopkins' former promoter America Presents, Ltd. (*America Presents, Ltd. v. Hopkins* or *America Presents*), and Hopkins' lawyer wanted to avoid the appearance of paying a witness.

Upon leaving HBO, DiBella went to work advising Hopkins on his public image and negotiating future fights for him. This included a fight with Antwun Echols in December 2000 that was broadcast on HBO using one of DiBella's valuable HBO dates. Hopkins won that fight and paid DiBella the $50,000 marketing fee in January 2001. DiBella then began negotiations with famed boxing promoter Don King to arrange a middleweight title unification match between three of King's fighters (William Joppy, the WBA title holder; Keith Holmes, the WBC title holder; and Felix Trinidad, a celebrated middleweight boxer) and Hopkins, the IBF title holder. DiBella agreed to use another of his HBO dates to broadcast this tournament. He also pressed Hopkins to accept a long-term contract with King, which King had made a precondition to agreeing to the match. Hopkins eventually signed a contract with King and the tournament was held on September 29, 2001. Hopkins won and became the undisputed world middleweight champion.

### B. *The Defamatory Statements*

During the months following this victory, Hopkins stopped communicating with DiBella. In an interview with boxing reporter Steve Kim, reprinted in an article Kim published in the online boxing magazine MaxBoxing.com on December 20, 2001 (Kim article), Hopkins stated

> Understand, every time I fought (the past couple of years), Lou DiBella got paid, even when he was with HBO,

which is f* *king wrong. What I'm saying is that the bottom line is, the Syd Vanderpool fight, should an HBO employee accept $50,000 while he's still working for HBO? ... So if they want the cat out [of] the bag, then let's let the f* *king cat out of the bag.

Ask HBO why an employee of their company asked me to give him $50,000? And I paid him too. Now, is that ethically right? You think Time Warner [the parent company of HBO] wants to hear about that? What I'm telling you right now is some serious, serious allegations, but these guys here try to make it seem like I'm the bad guy and Lou is probably whispering stuff around too, probably, but he probably isn't saying anything openly. And that influence can hurt me when I get to HBO, [DiBella] being friends with the people over there . . . .

... [I]t was me taking out of my career before I even fought Trinidad, that paid to get on a card. Was the money wired, or the checks sent prior, yeah, that was a way of not being discovered. The bottom line is, where did the $50,000 come from? It wasn't a gift. I didn't know him that well to give him $50,000. Way before he started establishing his relationship with me as far as an advisor. So what I'm saying is that every time Lou DiBella did something for Bernard Hopkins or played a role for Bernard Hopkins, even when he was with HBO, he got paid . . . .

· ... I can back up every damn thing I'm saying and it's going to make certain people who are wrong run under the covers and wish I never said ·it. Because other people are going to ask questions and they're going to start digging.

Steve Kim, *As the World of Bernard Hopkins Turns*, MaxBoxing.com, Dec. 20, 2001, *at* http://www.maxboxing.com/kim/kim122001.asp.

Hopkins repeated these allegations in other media outlets. In an article by Ron Borges published in the *Boston Globe* on December 24, 2001, Hopkins stated

This is a filthy, filthy game and you gotta be filthy to be in it. That's why I'm going to get out as soon as I can. Nobody is excluded from being led the wrong way by greed. Greed has proven through history to be man's worst enemy. You [DiBella] already received money, whether you should or you shouldn't, so you should keep your mouth shut and go about your business. Don't try and make me feel like an ingrate. They're all against me. When the truth comes out, you'll be shocked.

Nobody in this game does anything for nothing. I'm 36. I got no HBO contract. I can get on a card to make $500,000 if I give him $50,000. Why not? I didn't really see anything wrong with it. It's boxing. . . . I got the evidence right here on my coffee table. The wire transfers. The voided check. I know I ain't crazy. To get on that [HBO] card the fee was $50,000.

Ron Borges, *Hopkins Hops Around, Boston Globe*, Dec. 24, 2001, at D9 (alterations in original).

In another article by Bernard Fernandez published in the *Philadelphia Daily News* on January 10, 2002, Hopkins said of DiBella "When the guy says, 'I got HBO dates, you give me this [$50,000] and I'll get you one,' what am I supposed to do? ... Let the closet doors open and the skeletons will come out." Bernard Fernandez, *Hopkins Faces Lawsuit, Philadelphia Daily News*, Jan. 10, 2002, at 90. And, in an interview with Rich Marotta broadcast on ESPN Radio on February 1, 2002, Hopkins said

I paid [DiBella] $50,000 to get on the Roy Jones undercard in Indianapolis to fight Syd Vanderpool or I wouldn't have been on the card.... So my thing was is that, hey did you or did you not give $50,000 to an employee from HBO to be an undercard? Yes, I do. Do you have anything? Yes, I have. Here is right here. Now, whatever you wanna take from, well, you know that's criminal, right? ...

But you have to understand if you['re] under ... a regulation of TV, [then] you're not supposed to take a dollar from me to get on a card. It's called selling dates.

In December 2001, after learning of Hopkins' statements, DiBella brought a suit against him in the Southern District of New York, charging Hopkins with libeling DiBella in the interview with Steve Kim and in Hopkins' subsequent interviews with the press. The original complaint also alleged breach of contract and, alternatively, damages in *quantum meruit*. The breach of contract claim was dropped, and the jury rejected the *quantum meruit* claim. Thus, that claim is not part of this appeal.

### C. *Proceedings in the Trial Court*

A jury trial was held from November 4 to November 19, 2002. The jury returned a verdict in DiBella's favor on the libel claim arising from Hopkins' interview with Steve Kim, but rejected his three other claims connected with the articles by Ron Borges and Bernard Fernandez and the radio interview with Rich Marotta. The jury awarded plaintiff $110,000 in compensatory damages and $500,000 in punitive damages. On appeal DiBella challenges the trial court's jury instructions with respect to his burden of proof to show libel. The district court instructed the jury that "you [must] find by clear and convincing

evidence that [Hopkins'] statement was false." Plaintiff contends his burden of proof should have been preponderance of the evidence. DiBella claims that had the trial court charged preponderance of the evidence as the burden of proof, he would have succeeded on all of his claims against Hopkins, rather than just on his claim based on the Kim article.

On his cross-appeal, Hopkins challenges the denial of a motion he made for judgment as a matter of law to set aside the jury's verdict and order a new trial. Included in that motion was a request to set aside the verdict favorable to plaintiff as inconsistent with the three other verdicts. Hopkins also challenges the constitutionality of the libel judgment against him, the sufficiency of the evidence used to prove libel, three evidentiary rulings made during the trial, and the damages awarded to plaintiff.

## DISCUSSION

### I  Issues on Appeal

On his appeal, plaintiff asserts the district court erred in instructing the jury that he had to prove by clear and convincing evidence that Hopkins' statements were false. DiBella seeks to have the judgment reversed and the case remanded for a new trial on those libel claims that the jury rejected, with the jury instructed that it need only find falsity of Hopkins' statements by a preponderance of the evidence. DiBella also moves to strike Hopkins' request to supplement the record on appeal pursuant to Federal Rule of Appellate Procedure 28(j).

On his cross-appeal Hopkins contends that the district court committed reversible error on seven grounds. He argues (1) the libel judgment violates his freedom of speech under the First Amendment; (2) DiBella failed to satisfy his burden of prov-

ing falsity and malice; and (3) the jury's verdict in DiBella's favor on the libel claim related to the Steve Kim article is inconsistent with the jury's rejection of DiBella's three other libel claims. Hopkins further asserts the district court erred (4) in allowing DiBella to impeach attorney Joseph with an order to show cause from the *America Presents* litigation; (5) in admitting attorney Scott Magargee's unredacted time records after the close of evidence; and (6) in excluding the testimony of Hopkins' proposed expert witness. Finally, Hopkins asserts that (7) the evidence was insufficient to warrant the imposition of punitive damages.

■ In reviewing this record we construe all evidence, draw all inferences, and make all credibility determinations in favor of the party that prevailed before the jury. *See, e.g., Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 195 (2d Cir.2004). That is, we construe the record substantially in favor of plaintiff because the jury found in DiBella's favor on his major claim at trial. With respect to any facts particular to the three claims on which plaintiff lost, we of course construe the record in favor of defendant Hopkins.

## II The Standard of Proof for Falsity in a Libel Claim

■ The libel claims in this diversity case arise under New York law and, thus, we must apply that law to all the substantive matters before us. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). To prove libel in New York, a plaintiff must establish five elements: "(1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) defendant's fault, varying in degree depending on whether plaintiff is a private or public party; (4) falsity of the defamatory statement; and (5) injury to

plaintiff." *Meloff v. New York Life Ins. Co.,* 240 F.3d 138, 145 (2d Cir.2001). Because defendant disparaged plaintiff in his professional promotions and television packaging business, any libel is libel *per se* and injury to plaintiff is assumed. *Id.*

■ DiBella's achievements in the boxing industry are plain from the record, and the success with which he sought and obtained the public's attention by organizing and promoting boxing bouts seen by millions of HBO subscribers makes his characterization as a public figure appropriate. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The parties do not dispute this conclusion.

■ For public figures the third prong of the test for libel requires a showing of "'actual malice'—that is, with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion) (applying the *New York Times* actual malice standard to public figures that are not public officials). A plaintiff must prove actual malice by clear and convincing evidence. *Gertz,* 418 U.S. at 342, 94 S.Ct. 2997. Whether the federal Constitution requires plaintiffs to prove *falsity* by clear and convincing evidence is an open question. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. We express no view on this issue.").

## A. Standard of Review

■ We avoid reaching federal constitutional questions where a case may be decided on state law grounds. *Bell v. Maryland,* 378 U.S. 226, 237, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964); *Allstate Ins. Co. v. Serio,* 261 F.3d 143, 150 (2d Cir. 2001). This prudential doctrine has added weight here because under our diversity jurisdiction, we are obligated to apply New York's standard of proof for falsity, so long as we can safely determine the federal Constitution does not require a higher standard of proof.

■ States, of course, are free to offer greater protection to individual rights than federal law affords. *See, e.g., Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 178 (2d Cir.2000). When a state offers full protection to a federal right, state law necessarily disposes of the constitutional question because discussion of the federal requirement would be academic. If, however, the state standard is not fully protective of a given right, a court must reach the federal constitutional question because federal law could provide greater protection and thereby supercede state law. In this case, then, we must examine state law to determine whether it provides for the highest standard available—clear and convincing proof of falsity—thus rendering a discussion of the federal constitutional standard unnecessary.

■ Here, we are persuaded that state law requires clear and convincing proof of falsity, and decline therefore to address this open question in federal constitutional law. Having said that, we recognize at the outset that the New York Court of Appeals has not addressed New York's standard of proof for falsity in a defamation case. In the absence of authoritative law from the state's highest court, we must either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so uncertain that we can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,* 344 F.3d 211, 220–21 (2d Cir.2003).

■ We have considered and rejected the necessity of certifying this question of state law to the New York Court of Appeals. "[I]ssues of state law are not to be routinely certified to the highest court[ ] of New York ... simply because a certification procedure is available. The procedure must not be a device for shifting the burdens of this Court to those whose burdens are at least as great.... Because it is our job to predict how the forum state's highest court would decide the issues before us, we will not certify questions of law where sufficient precedents exist for us to make this determination." *Elliott Assocs., L.P. v. Banco de la Nacion,* 194 F.3d 363, 370 (2d Cir.1999). Certification is to be used in those cases "where there is a split of authority on the issue, where [a] statute's plain language does not indicate the answer, or when presented with a complex question of New York common law for which no New York authority can be found." *McCarthy v. Olin Corp.,* 119 F.3d 148, 153 (2d Cir.1997) (*quoting Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 51 (2d Cir.1992)).

We do not believe this case presents any of the exceptional circumstances that would justify using the certification procedure. Rather, in light of existing authority from New York and elsewhere on this matter, we must undertake the imprecise but necessary task of predicting on a reasonable basis how the New York Court of Appeals would rule if squarely confronted

with this issue. *See Michalski v. Home Depot, Inc.,* 225 F.3d 113, 116 (2d Cir. 2000). Our prediction is based on several sources.

Principally, we consider the language of the state intermediate appellate courts to be helpful indicators of how the state's highest court would rule. *See id.* at 116. Although we are not strictly bound by state intermediate appellate courts, rulings from such courts are a basis for "ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Statharos v. New York City Taxi & Limousine Comm'n,* 198 F.3d 317, 321 (2d Cir.1999). We also look to the language of other jurisdictions on the same issue and other sources the state's highest court might rely upon in deciding the question, including scholarly writings. *Michalski,* 225 F.3d at 116.

### B. *New York Appellate Division Cases*

The New York Appellate Divisions—with the exception of the Fourth Department, which does not appear to have written on the issue—have uniformly stated that a public figure in New York must prove falsity by clear and convincing evidence. *See New Jersey Steel Corp. v. Lutin,* 297 A.D.2d 557, 557–58, 747 N.Y.S.2d 89 (1st Dep't 2002); *Armstrong v. Simon & Schuster, Inc.,* 280 A.D.2d 430, 431, 721 N.Y.S.2d 340 (1st Dep't 2001); *Khan v. New York Times Co.,* 269 A.D.2d 74, 76–77, 710 N.Y.S.2d 41 (1st Dep't 2000); *Kaplansky v. Rockaway Press, Inc.,* 203 A.D.2d 425, 426, 610 N.Y.S.2d 581 (2d Dep't 1994); *Patane v. Griffin,* 164 A.D.2d 192, 195, 562 N.Y.S.2d 1005 (3d Dep't 1990).

These cases are not entirely persuasive. First, each simply states that New York requires clear and convincing proof of falsity without citing any relevant authority. In *New Jersey Steel, Armstrong, Khan,* and *Patane,* the courts cite *New York Times,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and its progeny for the proposition that actual malice must be proved by clear and convincing evidence, but provide no citation for the independent assertion that falsity should also be held to that standard. *See New Jersey Steel,* 297 A.D.2d at 557–58, 747 N.Y.S.2d 89; *Armstrong,* 280 A.D.2d at 431, 721 N.Y.S.2d 340; *Khan,* 269 A.D.2d at 76–77, 710 N.Y.S.2d 41; *Patane,* 164 A.D.2d at 195, 562 N.Y.S.2d 1005. *Kaplansky* cites authority for the proposition that the "plaintiff had to plead and prove by clear and convincing evidence that the words at issue were substantially false." 203 A.D.2d at 426, 610 N.Y.S.2d 581. The supporting cases simply state that the plaintiff has the *burden* of proving falsity, however, and are silent on the *standard* of proof. *See id.* (citing, inter alia, *Phila. Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 245, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 379–80, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977)). Hence, although these cases are quite clear on what the law in New York *is,* they do not give any indication of how that law came to be.

Second, we note that four of the Appellate Division cases did not turn on the falsity of the statements, and thus their assertions that New York requires clear and convincing proof of falsity are dicta. *See New Jersey Steel,* 297 A.D.2d at 558, 747 N.Y.S.2d 89 (reducing a damages award based on plaintiff's failure to demonstrate actual damages); *Armstrong,* 280 A.D.2d at 431, 721 N.Y.S.2d 340 (upholding

trial court's grant of summary judgment based on lack of proof of actual malice); *Khan*, 269 A.D.2d at 75, 710 N.Y.S.2d 41 (noting that defendant concedes falsity and only challenges the finding of actual malice); *Patane*, 164 A.D.2d at 195, 198, 562 N.Y.S.2d 1005 (noting that plaintiff abandoned his challenge to summary judgment in defendant's favor). The discussion of the standard of proof for falsity was not dicta in *Kaplansky*, however, because the plaintiff in that case appealed the trial court's finding that he failed to carry his burden of proving libel (including falsity and actual malice). *See Kaplansky*, 203 A.D.2d at 426, 610 N.Y.S.2d 581.

Nonetheless, Appellate Division cases are helpful indicators of state law, *Michalski*, 225 F.3d at 116, and we may look to the Appellate Division's statements concerning the standard of proof for falsity in New York, whether dicta or not, as persuasive evidence of the views of New York's intermediate appellate courts on the matter. Moreover, it would be inappropriate for a federal court to disregard these cases based solely on the lack of authoritative support for the assertions they contain. Whether or not the Appellate Divisions have articulated a reasoned basis for concluding that New York requires clear and convincing proof of falsity, there can be no doubt that those courts believe that to be the appropriate standard. Even though these cases do not totally persuade us that New York requires clear and convincing proof of falsity, it is plain that New York's intermediate appellate courts believe that is the appropriate standard of proof, and we consider this a helpful indicator of how the New York Court of Appeals would rule on this issue.

## C. *The Law of Other Jurisdictions*

We also consider the law of other jurisdictions to be a useful guide in predicting how the New York Court of Appeals would rule. We note that several federal courts relying on New York law, including this Court, have stated—albeit in dicta and without authoritative citation—that New York requires clear and convincing proof of falsity, and that most jurisdictions outside New York that have considered the issue have also adopted this standard of proof.

Our own case law is somewhat unclear on this point. In *Buckley v. Littell*, 539 F.2d 882 (2d Cir.1976), we stated that New York requires a public figure to prove with "convincing clarity *not only that the appellant's statements were false,* but that appellant knew they were false or made them with reckless disregard of their truth or falsity." *Id.* at 889–90 (emphasis added). This case conflicts with our view of New York law stated seven years earlier in *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir.1969), where we noted that *New York Times v. Sullivan* "changed state libel law only to the extent of requiring public officials to prove actual malice with convincing clarity. Other elements of proof ... *need only be proved by a preponderance of the evidence—the burden of proof imposed by New York law.*" *Goldwater*, 414 F.2d at 341 (emphasis added). We have not been able to identify a New York case decided between 1969 and 1976 reflecting a change in New York law. Nonetheless, several district courts applying New York law in diversity cases have followed our more recent view of New York's standard of proof as enunciated in *Buckley*. *See, e.g., Coliniatis v. Dimas*, 965 F.Supp. 511, 517 (S.D.N.Y.1997) (stating that "[w]here a plaintiff is a public official, he must prove 'by clear and convincing evidence' that the published material is false and that defendant published the material 'with actual malice'"); *World Boxing Council v. Cosell*, 715 F.Supp. 1259, 1262 (S.D.N.Y.1989) (ap-

plying clear and convincing standard to public figures); *Sharon v. Time, Inc.*, 599 F.Supp. 538, 558 (S.D.N.Y.1984) (same).

We also observe that many jurisdictions outside New York that have considered this issue have found clear and convincing proof of falsity is required for public figures and sometimes even for private figures. *See, e.g., Deutcsh v. Birmingham Post Co.*, 603 So.2d 910, 912 (Ala.1992) (holding that public figure plaintiff must prove falsity by clear and convincing evidence to succeed on a libel claim); *Barnett v. Denver Publ'g Co., Inc.*, 36 P.3d 145, 147 (Colo.Ct.App.2001) (same); *Carr v. Bankers Trust Co.*, 546 N.W.2d 901, 905–06 (Iowa 1996) (noting that plaintiff must prove falsity and malice by clear and convincing evidence); *Hoch v. Prokop*, 244 Neb. 443, 507 N.W.2d 626, 629 (1993) (stating that public figures must prove falsity by clear and convincing evidence to succeed on a libel claim); *Newman v. Delahunty*, 293 N.J.Super. 491, 681 A.2d 671, 674 (1994) (same); *Pritt v. Republican Nat'l Comm.*, 210 W.Va. 446, 557 S.E.2d 853, 862 (2001) (same); *cf. Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191, 1210 (1992) (stating that public figures must prove falsity by clear and convincing evidence to establish defamation consistent with First Amendment). In fact, courts have found good reason to favor the higher standard of proof. In *Robertson v. McCloskey*, 666 F.Supp. 241 (D.D.C.1987), for example, the district court held:

> [A] clear and convincing standard of proof for falsity would resolve doubts in favor of speech when the truth of a statement is difficult to ascertain conclusively. Indeed, as a practical matter, public-figure plaintiffs already bear such a burden, for in order to prove actual malice they must, of necessity, show by clear and convincing evidence that the defendant knew the statement was false or acted in reckless disregard of its

truth. Finally, [the standard] has more than merely a logical or symmetrical appeal. To instruct a jury that a plaintiff must prove falsity by a preponderance of evidence, but must also prove actual malice, which to a large extent subsumes the issue of falsity, by a different and more demanding standard is to invite confusion and error.

*Id.* at 248; *see Nev. Indep. Broad. Corp. v. Allen*, 99 Nev. 404, 664 P.2d 337, 343 n. 5 (1983) (noting that "[p]ractically speaking, it may be impossible to apply a higher standard to 'actual malice' than to the issue of falsity").

We acknowledge that a minority of jurisdictions require a public figure to prove falsity only by a preponderance of the evidence. *See, e.g., Moldea v. New York Times Co.*, 15 F.3d 1137, 1142 (D.C.Cir. 1994) (finding that plaintiffs need only prove falsity by a preponderance of the evidence under District of Columbia law); *Nat'l Ass'n of Gov't Employees/Int'l Bhd. of Police Officers v. BUCI Television, Inc.*, 118 F.Supp.2d 126, 130 (D.Mass.2000) (same under Massachusetts law); *Bentley v. Bunton*, 94 S.W.3d 561, 586–87 (Tex. 2002) (same under Texas law). We are also aware that the Ninth Circuit has concluded that our Circuit requires plaintiffs to prove falsity only by a preponderance of the evidence. *See Rattray v. City of Nat'l City*, 51 F.3d 793, 801 (9th Cir.1994) (stating that the Ninth Circuit "adopt[s] the holding of the Second Circuit" that falsity "need only be proven by a preponderance of the evidence"). The Ninth Circuit, however, relied on our decision in *Goldwater*, which, as we explained above, does not represent our most recent understanding of New York law on this issue.

To be sure, the state and federal cases expressing the majority view (i.e., clear and convincing proof of falsity) and the

minority view (i.e., preponderance of the evidence to prove falsity), like the New York Appellate Division cases on the subject, sometimes state the rule in dicta and without authoritative citation. Our role here, however, is merely to attempt to identify what other courts think about this issue, because this thinking would undoubtedly be taken into account by the New York Court of Appeals if and when it squarely confronts the issue. As with the Appellate Division cases, then, we believe the case law of other jurisdictions provides persuasive evidence of what the New York Court of Appeals' peers think about this matter, and thus establishes a useful marker for predicting how it would rule.

### D. *Other Sources*

We further note that the Committee on Pattern Jury Instructions of the Association of Justices of the Supreme Court of the State of New York has relied on New York Appellate Division cases in incorporating the clear and convincing evidence standard of proof for falsity in the New York Pattern Jury Instructions. *See* N.Y. Pattern Jury Instr. § 3:23 (stating that a plaintiff alleging libel "must prove by clear and convincing evidence that the statement was false, meaning substantially untrue"); *id.* commentary (relying, *inter alia,* on *Khan,* 269 A.D.2d 74, 710 N.Y.S.2d 41, and *Kaplansky,* 203 A.D.2d 425, 610 N.Y.S.2d 581). The district court charged the jury in this case with that instruction. Moreover, the leading treatise on defamation states that clear and convincing evidence is the prevailing standard of proof for falsity. 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 3.4, at 3–13 & n. 46 (3d ed.2003) (explaining that public figures "may have the burden not only of pleading and proving falsity, but also of establishing it 'with convincing clarity,'" reaffirming that "[m]ost courts that have addressed the

issue ... have required the higher standard of proof," and citing cases for that proposition).

■ In sum, we think there is significant and persuasive evidence from which to conclude that the New York Court of Appeals would hold that falsity must be proved by clear and convincing evidence. We base this conclusion on (1) the uniform view of the New York Appellate Divisions, (2) the majority view of other jurisdictions (both state and federal), (3) the fact that the clear and convincing evidence standard has already been incorporated into the New York Pattern Jury Instructions, and (4) scholarly writing in this field. As a consequence, we hold the district court correctly charged the jury requiring it to find falsity by clear and convincing proof.

### III  Hopkins' Claims

Hopkins raises seven claims on his cross-appeal. We briefly discuss each.

### A. *Constitutionality of the Libel Judgment*

■ Hopkins argues that the nature of his $50,000 payment to DiBella is a matter of interpretation, and thus the libel judgment entered against him punishes him for expressing his opinion that the $50,000 was a bribe. This, he contends, violates his right to freedom of speech under the First Amendment. Hopkins' belief about the $50,000 is a question of fact, and in finding that Hopkins libeled DiBella, the jury necessarily concluded that Hopkins knew or should have known that his statements about DiBella were false. It is well settled that when a plaintiff meets the evidentiary standards for proving libel, the speech at issue loses its constitutional protection and exposes the defendant to damages. *Cf. New York Times Co.,* 376 U.S. at 279–80, 84 S.Ct.

710. Accordingly, Hopkins' constitutional challenge is misplaced. His challenge is more appropriately directed to the sufficiency of the evidence by which the jury concluded that his statements were an intentional misstatement of fact rather than simply his opinion. Thus, we move to the sufficiency argument.

## B. *Sufficiency of the Evidence to Prove Falsity and Malice*

Hopkins asserts that DiBella did not prove by clear and convincing evidence that Hopkins' statements were false and that DiBella failed to prove that Hopkins acted with actual malice. Because of these alleged failures of proof, Hopkins maintains that the district court erred in not granting his post-trial motion for judgment as a matter of law.

■■■ When considering a post-verdict motion for judgment as a matter of law, the trial court should view all the evidence in the record as a whole and "draw all reasonable inferences in favor of the nonmoving party, [but] it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A district court may set aside a verdict only where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him." *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 168 (2d Cir.1980).

Notwithstanding the above principles, Hopkins invites us to engage in a more searching appraisal of the factual record because there is an added layer of review

with respect to the actual malice element of libel: Appellate judges "must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). This does not mean that an appellate court may sit as an independent trier of fact, nor is the independent review function equivalent to a *de novo* review of the ultimate judgment itself. In other words, a reviewing court may not make its own appraisal of all the evidence to decide whether judgment should be entered for plaintiff. *Id.* at 514 n. 31, 104 S.Ct. 1949.

■■■ Instead, the task of a reviewing court is to examine only those statements related to the issue of malice and the circumstances under which they were made to establish whether the actual malice standard is met. *See id.; see also Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678 (noting that the reviewing court must ensure that the principles of the First Amendment are protected). Hence, we engage in only limited *de novo* review of the record to determine whether there is sufficient evidence to find clearly and convincingly that Hopkins made his statements with actual malice, according traditional deference to the jury's underlying credibility determinations.

■■■ From our *de novo* review of the record with respect to the actual malice element of libel we conclude that Hopkins said that he told Steve Kim that he (Hopkins) paid DiBella to get on the Jones–Hall undercard, that the transaction was surreptitious, and that "every time Lou DiBella did something for Bernard Hopkins or played a role for Bernard Hopkins, even when he was with HBO, he got paid." DiBella's testimony and the testimony of

HBO executives, however, painted a completely different picture: the payment was not surreptitious, was not made while DiBella was still employed by HBO, did not have anything to do with Hopkins getting on the undercard, and Hopkins was aware of the true facts when he made his statements to Kim. Thus, the jury heard significantly different accounts of what transpired between Hopkins and DiBella, and it was entitled to believe some witnesses and discredit others. The jury by its verdict found that DiBella and his witnesses were credible and that Hopkins was not.

Hopkins was present when Joseph offered to pay DiBella $50,000 on May 19, 2000, and Hopkins also knew that DiBella was actually paid in January 2001. Hopkins thus knew the payment was not made while DiBella was still employed at HBO. Hopkins knew or should have known that the payment was for future services that DiBella intended to perform for Hopkins once DiBella left HBO, not as a *quid pro quo* for getting on the Jones–Hall undercard.

Accordingly, there is evidence that, when viewed in the light most favorable to DiBella, clearly and convincingly shows that the statements Hopkins made about the nature of his $50,000 payment to DiBella were false and that Hopkins knew or should have known they were false when he made them, or that he spoke with reckless disregard of the statements' truth or falsity. Thus, Hopkins acted with actual malice. Therefore, his motion for judgment as a matter of law was properly denied.

### C. *Inconsistency of the Jury's Verdicts*

Hopkins insists that the district court erred in denying his post-verdict motion to set aside the jury's verdicts—three in his favor and one against him—as inconsistent. Essentially, he maintains it was unreasonable and inconsistent for the jury to find he did not libel DiBella in the Borges and Fernandez articles, or in the Marotta radio interview, but that he did libel DiBella by his similar comments in the Kim article.

■ We need not reach or decide this issue because Hopkins waived it by failing to raise an objection to the inconsistent verdicts while the jury was still empaneled. Instead he raised this objection for the first time in his post-trial motions. It is well settled that if a party does not challenge the consistency of jury verdicts while the jury is still empaneled, the objection is waived. *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 54–56 (2d Cir. 1992); *United States Football League v. National Football League*, 842 F.2d 1335, 1367 (2d Cir.1988).

### D. *The Order to Show Cause*

■ Hopkins maintains it was error to allow DiBella to impeach Joseph's testimony with an order to show cause from the *America Presents* litigation requesting evidence on whether Joseph was truthful before that court. Hopkins seeks to supplement the record on appeal with Judge Kane's recent opinion in *America Presents, Ltd. v. Hopkins*, 330 F.Supp.2d 1217 (D.Colo.2004), in which Judge Kane concludes that Joseph, in fact, perpetrated "no fraud" on the Colorado district court. *Id.* at 1233. DiBella moved to strike Hopkins' request. In granting the motion to strike, we conclude that the district court correctly ruled that the order to show cause was admissible for impeachment purposes.

Joseph took the stand in the trial below to testify regarding the circumstances surrounding Hopkins' $50,000 payment to DiBella, and thus put his credibility at issue. *See* Fed.R.Evid. 613(b). The transcript of Joseph's comments in the *America Presents* litigation, on which the order to show

cause was based, indicates that in the district court in Colorado, Joseph denied that any kind of relationship between DiBella and Hopkins existed. DiBella's attorney, Judd Burstein, Esq., sought to impeach Joseph on cross-examination with the order to show cause entered by Judge Kane in the then-pending *America Presents* litigation in Colorado. This order was entered following an allegation by America Presents that attorney Joseph lied to the court in August 2000 by saying that there was "no relationship" between DiBella and Hopkins when, in fact, DiBella had been advising and representing Hopkins for three months. Joseph knew of this relationship because he offered DiBella a check for $50,000 in May 2000 to pay DiBella for his services. Judge Kane thought he may have been misled and ordered the parties to show cause why he should not reopen the record and grant a mistrial. That order to show cause was admitted in the instant litigation to challenge Joseph's underlying statements for impeachment purposes.

After Joseph explained on cross-examination what he meant by the statement that DiBella and Hopkins had no relationship, the jury below could independently determine whether this statement was consistent with Joseph's testimony that he was involved in preparing a $50,000 payment from Hopkins to DiBella three months prior to making the statement.

The order to show cause gave Joseph a powerful incentive to portray the $50,000 as a bribe rather than a legitimate payment for services, because if Joseph testified in the instant trial that the payment was above board, he would essentially admit that he had lied to the district court in Colorado. Judge Chin instructed the jury on the meaning of the order to show cause, carefully explaining that it was not a finding by the Colorado district court that

Joseph had lied. That instruction gave the jury all of the information necessary to properly weigh the order's impeachment value. Hence, it was properly admitted in evidence.

■ Hopkins further moved under Federal Rule of Appellate Procedure 28(j) to supplement the record with Judge Kane's recent decision in *America Presents*, in which Judge Kane found that Joseph perpetrated "no fraud" on the court. Hopkins contends that this irrefutably proves the district court allowed inaccurate and prejudicial evidence to be admitted at trial, and thus reversal is justified. As a threshold matter, Hopkins cannot introduce Judge Kane's factual conclusions into the record before this Court. Under Rule 28(j), only "pertinent and significant *authorities* [that] come to a party's attention after the party's brief has been filed[,] or after oral argument but before decision" may be added to the record on appeal. Fed. R.App. P. 28(j) (emphasis added). The Rule *cannot* be used to submit new *evidence* to the appeals court. *Bowman v. City of Franklin*, 980 F.2d 1104, 1107 n. 1 (7th Cir.1992); *Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 773 (9th Cir.1992).

Judge Kane's factual conclusions regarding whether or not Joseph lied to him constitute additional evidence that affect the weight of the order to show cause used to impeach Joseph's testimony. The possibility that new facts—had they been known two years ago when the jury heard Joseph's testimony—might have affected the jury's assessment of his credibility, is immaterial. Rule 28(j) simply does not allow this type of evidence to be introduced for the first time on appeal and therefore we grant DiBella's motion to strike it.

### E. *Admission of the Unredacted Time Sheet*

█ Hopkins contends that the district court committed reversible error in re-opening the factual record during DiBella's summation to allow the unredacted time record of another of Hopkins' lawyers, Scott Magargee, Esq., to be published to the jury. We see no error in the district court's decision to reopen the record and admit the time sheet.

At trial, attorney Magargee testified that he was present at an April 11, 2000 meeting with Joseph and Hopkins, during which DiBella called and spoke to the group via speakerphone. Magargee testified that DiBella said "that he could get or could convince HBO to get Bernard [Hopkins] on that undercard.... And he also said that his fee in connection with that, or for his services, would be $50,000." Hopkins' present lawyer, Robert Hayes, Esq., with whom attorney Magargee is associated, submitted Magargee's time sheets as added proof that the meeting took place. Hayes submitted the redacted time sheets ostensibly to protect privileged material. Magargee testified that from the client billing numbers and other matters noted on his time sheet, he was sure that the date on which DiBella called was April 11, 2000.

The time sheet contained no mention of any contact between Hopkins and Magargee on that day. When DiBella's attorney attempted to cross-examine Magargee on this point, Hayes objected, stating "It's been redacted." This precipitated a sidebar and instruction to the jury to disregard Hayes' objection. Judge Chin also asked to inspect the unredacted time sheet *in camera* to determine what had been redacted. The document was not reviewed until plaintiff's counsel's summation, during which Judge Chin realized that "Calls with B. Hopkins" had been redacted.

Judge Chin interrupted attorney Burstein's summation and immediately called another sidebar. Noting that the entry "Calls with B. Hopkins" strongly suggested that attorney Magargee had *called* Hopkins that day but had not *met* with him, Judge Chin rebuked defense counsel Hayes for withholding the information and, at attorney Burstein's request, reopened the record and allowed the evidence to be published to the jury. In an opinion denying defendant's post-verdict motion for judgment as a matter of law Judge Chin fully explained that there was no privileged communication, and it was instead selective redaction. *Dibella v. Hopkins,* 285 F.Supp.2d 394, 409 (S.D.N.Y.2003). Judge Chin declined to sanction Hayes but referred the matter to the district court's Committee on Grievances. *Id.* at 410. Hayes appealed that decision. Another panel of this Court determined that we lacked jurisdiction over the matter and dismissed Hayes' appeal on May 4, 2004.

█ "A motion to reopen the record for the presentation of new evidence is addressed to the sound discretion of the [trial] court," and it may only be reversed on appeal if the trial court abused its discretion. *See Ammar v. United States,* 342 F.3d 133, 141 (2d Cir.2003). Hopkins asserts that there are two grounds on which the district court abused its discretion: (1) the entry "Calls with B. Hopkins" was not within the scope of Judge Chin's discovery order, and thus Hopkins had no obligation to produce it; and (2) the entry "Calls with B. Hopkins" was privileged, and thus Judge Chin could not order it to be shown to the jury. Neither argument is persuasive.

#### 1. Scope of the Discovery Order

At his pre-trial deposition, after Magargee stated that he represented Hopkins in other areas unrelated to the present litiga-

tion or the *America Presents* litigation, the parties telephoned Judge Chin for two rulings before the deposition proceeded: (1) What matters, extraneous to the present litigation, could DiBella's counsel inquire about consistent with attorney-client privilege?; and (2) What time records could DiBella demand that Hopkins' counsel produce to prove whether Magargee was actually at the April 11, 2000 meeting? Judge Chin, speaking extemporaneously via telephone, ruled that "in a general sense [Magargee] should testify to what the firm does for Mr. Hopkins." Judge Chin further stated that if there is a record that corroborates whether there was a meeting at which the witness was present, that is relevant. When attorney Burstein clarified DiBella's request for "any record relating to this supposed April telephone conversation," Judge Chin replied, "That's fine. It's just the time record for the one meeting if one exists."

The entry "Calls with B. Hopkins" on Magargee's April 11, 2000 time sheet clearly falls within this order. The district court's ruling contemplated information relevant to whether the witness was at the meeting and whether such a meeting took place. While it is technically true that the entry "Calls with B. Hopkins" is not a time record for the actual meeting, the entry is clearly probative. The proper scope of the trial court's discovery order thus encompasses the entry. This should have been obvious to Hopkins' counsel since the court said it was "fine" in response to Burstein's request for "any record relating to this supposed April telephone conversation." Hence, the district court did not abuse its discretion by demanding the production of the time sheet entry after the close of evidence.

### 2. Attorney–Client Privilege

▮▮▮▮ Hopkins avers that the time entry was protected by attorney-client privilege

and thus properly redacted. Specifically, he declares that the district court improperly relied on the federal common law of privilege in finding that the entry was not privileged; Hopkins claims that state privilege law, which is controlling in this case, compels a different result.

We agree with Hopkins that New York law applies. Federal Rule of Evidence 501 states, "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, ... shall be determined in accordance with State law." Under New York law, however, the time record at issue is not privileged. In New York, attorney time records and billing statements are not privileged when they do not contain detailed accounts of the legal services rendered. *See Eisic Trading Corp. v. Somerset Marine, Inc.*, 212 A.D.2d 451, 451–52, 622 N.Y.S.2d 728 (1st Dep't 1995). Time records and billing statements that are "detailed in showing services, conversations, and conferences between counsel and others" to such an extent that "to allow access to [the] material would disclose ... trial strategy, and reveal the ... legal work that has been done by [the party's attorneys]" are privileged in New York. *Licensing Corp. of Am. v. Nat'l Hockey League Players Ass'n*, 153 Misc.2d 126, 128, 580 N.Y.S.2d 128 (N.Y.Sup.Ct. 1992).

The entry "Calls with B. Hopkins" is not privileged under this rule. It is not detailed in any respect, and it conveys no information about discovery, trial strategy, factual investigation, or any other legal services rendered. To the extent that Hopkins claims it reveals conversations and conferences between attorney and client, we note that Magargee, with Hopkins' consent, testified that he had con-

versed and conferenced with Hopkins that day, so Hopkins can hardly be heard to assert privilege on that ground. Indeed, Hopkins' privilege claim seems to be based on protecting information regarding the *medium* by which Hopkins and Magargee conversed. This information is not privileged, and, as Judge Chin concluded, the assertion of privilege on such a ground in this case (where a telephone conversation between Magargee and Hopkins casts doubt on Magargee's testimony that he met with Hopkins in person) smacks of an intent to mislead. *Dibella*, 285 F.Supp.2d at 409.

Thus, the trial court's decision to reopen the record and allow the unredacted time sheet to be published to the jury was well within its discretion.

### F.  *Exclusion of Hopkins' Expert*

▮ Hopkins avers that refusing to allow W. Michael Hoffman, Hopkins' expert on business ethics, to testify was error. Hopkins sought to have Hoffman testify that it was unethical for DiBella to solicit a $50,000 payment from Hopkins while still employed by HBO. Federal Rule of Evidence 702 allows expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony must be helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson. Whether to admit expert testimony is a matter left to the discretion of the trial judge and is set aside only when the decision is "manifestly erroneous." *United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir.1991). Hopkins argues that the district court rejected Hoffman's testimony because it did not believe Hoffman, and that this constitutes manifest error. To the contrary, the district court had ample grounds for refusing to allow Hoffman to testify.

The district court concluded that the report from which the expert proposed to testify made "conclusions, observations, and speculations [that] are not proper testimony from an expert witness." *Dibella v. Hopkins*, No. 01 Civ. 11779, 2002 WL 31427362, at *4 (S.D.N.Y. Oct.30, 2002). For example, Hoffman characterized Joseph as "a credible witness," despite the rule that expert witnesses may not testify based on their personal view of the veracity of a lay witness's testimony. *See United States v. Scop*, 846 F.2d 135, 142 (2d Cir.1988), *rev'd in part on other grounds*, 856 F.2d 5 (2d Cir.1988). Hoffman also inappropriately drew a legal conclusion by opining that DiBella's actions amounted to extortion. *See id.* at 139 ("[Expert witness] statements embodying legal conclusions exceed[ ] the permissible scope of opinion testimony under the Federal Rules of Evidence.").

In addition, the district court correctly concluded that Hoffman's testimony would unnecessarily confuse the jury because the real issue in the case was not whether DiBella acted ethically, but rather what actually transpired between DiBella and Hopkins—i.e., whether the $50,000 was or was not a bribe, and whether Hopkins did or did not believe it was a bribe. *Dibella*, 2002 WL 31427362, at *4. Thus, it was not an abuse of the district court's discretion to exclude Hoffman's testimony.

### G.  *Sufficiency of the Evidence to Support Punitive Damages*

Finally, Hopkins argues that there was insufficient evidence to support an award of $500,000 in punitive damages, and that such an award for the publication of a single defamatory article is unconstitutionally excessive.

Hopkins confuses two distinct inquiries in his appeal: first, whether the evidence supported an award of punitive damages at all and, second, whether the amount is unconstitutionally excessive. Insofar as Hopkins challenges the amount as excessive, his claim is procedurally barred. Hopkins failed to challenge the amount of the punitive damages in his post-trial motion for judgment as a matter of law; the district court expressly found that Hopkins only argued that there was no basis for an award of punitive damages. *Dibella*, 285 F.Supp.2d at 403. As we stated in *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73 (2d Cir.2003), excessive punitive damages that allegedly violate the Due Process Clause may be challenged through post-trial motions after the verdict is entered. *Id.* at 89. It is critical in preserving the issue for appellate review that the district court have an opportunity to rule first on the excessiveness issue. *Id.* By not raising his excessiveness objection before the district court, Hopkins failed to preserve this issue for our review.

Hopkins' preserved objection to the award of punitive damages—that there was insufficient evidence to support an award of punitive damages—is without merit. Under New York law, punitive damages in a defamation case are justified "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." *Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 479–80, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993). This is not automatically satisfied by the requisite finding of "actual malice" for libel; rather, it requires "hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice." *Id.* at 480, 605 N.Y.S.2d 218, 626 N.E.2d 34. New York Pattern Jury Instruction § 3:30, under which Judge Chin charged the jury, is in accord with this standard.

There is ample evidence from which the jury could have concluded that Hopkins acted with hatred, ill will, and spite, and deliberately attempted to injure DiBella. The jury heard a recording of Hopkins' entire conversation with Steve Kim, and was in a position to evaluate Hopkins' statements in context. Kim testified that he understood Hopkins to be specifically asking him to write and publish an article containing the false accusations against DiBella. Hopkins also told Kim that he wanted Kim to print his comments (which, again, the jury found Hopkins knew were false) because, as a reporter, "you can't be held accountable for nothing because you're protected by the Constitution of America." Although the jury did not find that the subsequent dissemination of these allegations in the *Philadelphia Daily News, Boston Globe,* and on ESPN Radio amounted to libel, it is uncontroverted that Hopkins repeated his allegations about DiBella to just about anyone who would listen. Based on this evidence, the jury could readily have found that Hopkins acted with ill will and maliciousness in spreading false allegations about DiBella. This is sufficient to sustain an award for punitive damages.

## CONCLUSION

We have considered the appellant's and cross-appellant's remaining arguments and find them all to be without merit. Accordingly, the judgment is affirmed, and DiBella's motion to strike is granted.